COMMONWEALTH *vs.* JOSEPH T. GALVIN.

Suffolk.     May 3, 1948. — July 23, 1948.

Present: QUA, C.J., LUMMUS, DOLAN, SPALDING, & WILLIAMS, JJ.

*Pleading, Criminal,* Indictment. *Practice, Criminal,* Disclosure of evidence of Commonwealth, Grand jury proceedings, Empanelling of jury, New trial. *Grand Jury. Homicide. Jury and Jurors. Evidence,* Relevancy and materiality, Of identity, Photograph, Admissions and confessions, In cross-examination, In rebuttal.

A motion to quash an indictment for murder in the first degree rightly was denied where the form of the indictment was that set forth in G. L. (Ter. Ed.) c. 277, § 79.

No abuse of discretion appeared in the denial of a motion by a defendant indicted for murder in the first degree to require the district attorney to furnish him with a transcript of the evidence offered before the

grand jury and copies or memoranda and notes of any oral or written confession, and a description of the person and dress of the one alleged to have committed the crime.

A motion to quash an indictment on the ground that it was based on incompetent and insufficient evidence before the grand jury, and a motion that certain persons be ordered to appear and testify at the hearing of that motion, rightly were denied.

No error was shown in voluntary action by a judge presiding at the trial of an indictment for murder 8 during the empanelling of a jury, after he and juror number 12 had been accepted, because the judge then learned from juror number 8 that his "present state of mind" was "that, even if the evidence warranted conviction of murder in the first degree," he "would not want to come to that" and that he then had "an opinion with reference to the guilt or innocence of" the defendant which "would prevent" him "from arriving at a just decision."

No error appeared in the admission, at the trial of an indictment for murder by assault accompanied by theft of the victim's handbag, of testimony respecting conversations in which the defendant participated, which had a bearing on the state of the defendant's finances about half an hour before the crime and which were in corroboration of previous testimony admitted without exception.

No error appeared, at the trial of an indictment for murder, in a refusal to strike out testimony of a police officer, who had seen a man running from the scene of the crime but had not seen his face, identifying the defendant as that man from his "particular" style of running in the station house about two weeks after the crime.

At the trial of an indictment charging murder by assault, photographs of the victim of the assault properly were admitted in evidence.

Evidence of alleged statements and confessions by the defendant properly was admitted at the trial of an indictment for murder following a preliminary hearing by the trial judge in the absence of the jury and a finding by him that they were made voluntarily.

No error appeared in questions asked in cross-examination of a defendant charged with murder to contradict testimony by him in direct examination as to the real reason which led to his making admissions and confessions tending to prove his guilt.

At the trial of an indictment charging murder, no error appeared in cross-examination of the defendant to prove his knowledge of police routine in connection with his actions and statements while under arrest where no attempt was made to introduce evidence of other offences committed by him, and where he had testified to previous experiences while under arrest.

Following testimony by a defendant charged with murder that he did not know the victim had died when he made certain admissions, evidence of a statement made to the defendant by a police officer before the making of the admissions, offered by the Commonwealth in rebuttal, was admissible, not as evidence of the defendant's guilt, but to show that he did know of the victim's death when he made them.

Evidence at the trial of an indictment for murder, which included evidence of a voluntary admission and confession by the defendant, war-

ranted a finding that the defendant committed a brutal assault on a woman resulting in her death in order to rob her of her handbag, and a verdict of guilty of murder in the first degree.

No abuse of discretion appeared in the denial of motions for a new trial of an indictment for murder on the ground that the verdict was against the evidence, the law and the weight of the evidence, and also on the ground of alleged newly discovered evidence, including evidence not of such a character that it would be likely to be a real factor in affecting the result of the case and evidence not offered to show insanity of the defendant but to show that he was a chronic alcoholic and a victim of alcoholic psychosis and pathological intoxication.

INDICTMENT, found and returned on November 16, 1945, charging the defendant with murder.

The case was tried before *Hanify*, J.

*B. W. Taylor*, for the defendant.

*J. F. McAuliffe*, Assistant District Attorney, for the Commonwealth.

WILLIAMS, J.    On October 23, 1946, the defendant was found guilty of murder in the first degree on an indictment returned by the grand jury on November 16, 1945, which charged that the defendant "on the eighth day of October in the year of our Lord one thousand nine hundred and forty-five, did assault and beat one Sarah Rodman, with intent to murder her, and by such assault and beating did kill and murder the said Sarah Rodman." The case is before us, after sentence, upon the defendant's appeal accompanied by an assignment of errors, a summary of the record, and a transcript of the evidence, as required by G. L. (Ter. Ed.) c. 278, §§ 33A–33G, as amended by St. 1939, c. 341. See *Commonwealth* v. *McDonald*, 264 Mass. 324; *Commonwealth* v. *Taylor*, 319 Mass. 631.

There was evidence substantially as follows. At or about 10: 50 P.M. on the evening of October 8, 1945, the body of Sarah Rodman, an unmarried woman forty-one years of age, was found on the sidewalk in front of her home at number 7 Fottler Road in the Mattapan–Dorchester district of Boston. The woman had left her place of employment in Cambridge about 9:50 P.M. carrying a black handbag which contained a small amount of money and some articles of personal property. When her body was found the bag was missing. She was lying on her back across the sidewalk

with her head toward the street and her feet toward the steps which led up to the front walk of the house in which she lived. Her skirt was "a bit up from her waist," her undergarments were not disturbed, her left shoe was partly off, and her right shoe was lying six to eight feet north of the body on the sidewalk. Her face was badly cut and bruised and her skull was fractured in several places. She was unconscious and died in the hospital the following morning from her injuries. In the opinion of the medical examiner the fractures of the skull were caused by the use of a blunt instrument in the nature of a club, possibly a bottle. Injuries to the neck were consistent with an act of throttling.

The body was found by a police officer, Thomas M. Norton, who was returning from the theatre to number 11 Fottler Road, next door to the Rodman house. As he drove up the street and turned left into a driveway, the lights of his automobile disclosed a beach wagon some seventy feet distant in front of number 7 Fottler Road and a man stooping over or crouching on the sidewalk. This man stepped over toward the beach wagon as if to conceal himself and then, as the lights of Norton's automobile caught him, straightened up and ran across the banked front lawn of the house on the corner of Hazleton Street and disappeared around the corner to the northwest. As he ran he was in Norton's view for a distance of about sixty-four feet but Norton did not see his face. Norton alighted from his automobile, and then saw the body of the woman on the sidewalk. He ran after the man but failed to find him. Although a search of the neighborhood was made the next morning Miss Rodman's bag was not found.

Fottler Road is a short street about six hundred feet northwest of and parallel to Blue Hill Avenue, extending between Walk Hill Street on the southwest and Hazleton Street on the northeast. The place where the body was found was on the northwest side of Fottler Road about seventy-four feet from the corner of Hazleton Street. Hazleton Street intersects Blue Hill Avenue about six hundred twenty-five feet southwest of a certain café called Blanders. The defendant, who was unmarried and was

living with his mother and sister at 11 Mulvey Street, a street in the vicinity of Fottler Road, had spent most of the evening of October 8 in this café drinking ale. Since early morning he had been drinking at various places along Blue Hill Avenue. His funds were low, and during the day he had borrowed money from an acquaintance. He left Blanders Café around 10:40 P.M. and did not return. Shortly before 11 P.M. he boarded a street car at a stopping place on Blue Hill Avenue between Blanders Café and the end of Hazleton Street and rode to Egleston Square. From there he went to Dover Street and spent the night in a vacant building with which he was familiar on Fay Street off of Dover Street. The following morning he signed up to work with a railroad construction gang, and with other employees went by train to New Haven and from there to a construction camp at Montuwese, Connecticut. He left that camp the next morning and "thumbed" his way to New York city. There he obtained some work in the Beth Abraham Home for Incurables. He was treated in the Bellevue Hospital for some form of alcoholism, and on October 22 "hitchhiked" his way back to Boston. On the afternoon of October 23 he appeared in Blanders Café and was told that the police were looking for him. He went to police station 19 and was arrested and booked. At the station house he said that he had been told by Marie Cerbone, the proprietress of Blanders Café, that he was wanted by the police for hitting a woman over the head with a bottle. Mrs. Cerbone later denied in his presence that she had made any such statement. Until that time the police had no knowledge that a bottle had been used in the assault on Miss Rodman. Later, in the early evening of October 24, Police Officer Norton, after observing the defendant run across the guard room of the station house, identified him by the "particular" way he ran as the man whom he had seen run from Fottler Road on the night of October 8.

When first interrogated by the police as to his actions on the evening of October 8, the defendant stated that he went home early and the next morning "thumbed" his way from Mattapan Square to New York. Accused of lying, he then

changed his statement and said that he spent the night in town on Fay Street and went to Connecticut the next morning. He denied that he had anything to do with the assault on Miss Rodman. Later he confessed that he "did it." He stated that he went up in the vicinity of Fottler Road with the intent of grabbing a handbag which some person might be carrying; that he "shouldered" a woman on Fottler Road, knocked her down, seized her handbag and, being chased by "some fellow," ran down Hazleton Street toward Blue Hill Avenue; that he took $3 in bills from the handbag, which also contained a ration book and coin purse, and threw the bag into the bushes in front of the library on Hazleton Street between Fottler Road and Blue Hill Avenue. When asked what he did with the bottle, he said that he threw it in the sewer and then added, "What bottle?"

At the trial he denied the truth of the facts concerning the assault which had been related by him to the police. He contended that, after being struck by Captain Graham of station 19, he was induced to make such statements by threats of future violence made by various members of the police force. He said that he had been brutally assaulted by the police at some earlier time and was in fear of the police. He testified that he did not know the woman had died, that he thought he was only admitting the snatching of a handbag and that he would get perhaps from thirty to sixty days, which he preferred to accept, rather than to take a beating by the police. He gave as a reason for not returning home on the night of October 8 that his sister had told him not to come home because he had been drinking.

The defendant's assignments of error, based on exceptions saved at the trial, are considered in their numerical order.

1. There is no merit to the exception to the denial of a motion to quash the indictment on the ground that it was vague, indefinite and in violation of art. 12 of the Declaration of Rights. The form used was that provided by G. L. (Ter. Ed.) c. 277, § 79, and does not violate the provisions of the Constitution of the Commonwealth. *Commonwealth* v. *Jordan,* 207 Mass. 259, 266. *Commonwealth* v. *Bartolini,*

299 Mass. 503, 509. *Commonwealth* v. *Green*, 302 Mass. 547, 553. *Commonwealth* v. *Giacomazza*, 311 Mass. 456, 460, 561. If the allegations were not sufficient to enable the defendant to prepare his defence, he was entitled as matter of right to "such particulars as may be necessary to give . . . [him] reasonable knowledge of the nature and grounds of the crime charged." G. L. (Ter. Ed.) c. 277, § 40.

2. The defendant moved that the district attorney be ordered to furnish him with a transcript of the evidence offered before the grand jury, the copies of, or memoranda or notes made of, any oral or written confession, and a copy of the medical examiner's report of the autopsy, and to permit an inspection of any weapon claimed to have been used by the defendant in committing the assault. The district attorney voluntarily exhibited to counsel a bottle wrapped in a stocking as the weapon alleged to have been used [1] and gave him a copy of the autopsy report. Otherwise the motion was denied. As to the grand jury evidence and evidence relating to a confession, "it was within the discretion of the judge to grant or refuse the motion. . . . [It] was . . . an attempt . . . to compel the Commonwealth to disclose, in part at least, the evidence on which it relied. There is no rule of law which requires the Commonwealth to do that, or which gives a defendant the right to ask it." *Commonwealth* v. *Jordan*, 207 Mass. 259, 264, 265. The defendant "had no right to examine 'minutes' of the grand jury or evidence taken before or exhibited to them." *Commonwealth* v. *Bartolini*, 299 Mass. 503, 508. See *Commonwealth* v. *Goldberg*, 212 Mass. 88, 91, 92; *Commonwealth* v. *Gettigan*, 252 Mass. 450, 464; *Commonwealth* v. *Giacomazza*, 311 Mass. 456, 462. The same rule applies to copies of confessions in the possession of the district attorney. *Commonwealth* v. *Giacomazza*, 311 Mass. 456, 462. There was no error in the denial of the motion.

3. A second motion to quash the indictment on the ground that it was based on incompetent and insufficient evidence was properly denied. The court will not inquire

---

[1] This bottle was produced at the trial but was not offered in evidence, following a conference at the bench.

into the competency or sufficiency of the evidence before the grand jury. *Commonwealth* v. *Woodward*, 157 Mass. 516. *Commonwealth* v. *Walsh*, 255 Mass. 317, 319. *Commonwealth* v. *Ventura*, 294 Mass. 113, 120, 121. *Commonwealth* v. *Lammi*, 310 Mass. 159, 163, 164.

4. For the same reason a motion that certain named persons be ordered to appear and testify at the hearing on the motion to quash the indictment, because the evidence given by them before the grand jury was inadequate and incomplete, was properly denied.

5. A second motion to obtain evidence, renewing the requests of the previous motion stated in paragraph 2, *supra*, and adding a demand for a description of the person and dress of the one alleged to have committed the crime, was denied rightly for reasons previously stated. See *Commonwealth* v. *Wakelin*, 230 Mass. 567, 571; *Commonwealth* v. *Giacomazza*, 311 Mass. 456, 460, 461.

6. After the filing of a motion for particulars the Commonwealth specified that the assault on Miss Rodman occurred in the Mattapan–Dorchester section of Boston between the hours of 10 P.M. and 12 midnight on October 8, 1945, and that the weapon used was a "blunt instrument." The denial of the motion for further particulars was within the discretion of the judge and no abuse of that discretion appears. The defendant was sufficiently informed of the charge against him. *Commonwealth* v. *Robertson*, 162 Mass. 90. *Commonwealth* v. *Snell*, 189 Mass. 12, 18–19. *Commonwealth* v. *Jordan*, 207 Mass. 259, 265. *Commonwealth* v. *Giacomazza*, 311 Mass. 456, 460, 461.

7. Assignment 7 is waived.

8. Assignment 8 refers to the action of the judge in excusing juror John J. Brown after he had been accepted as juror number 8 by both parties and had been sworn. After juror number 12 had been accepted, Brown, juror number 8, stepped to the bench, spoke to the judge, and the following colloquy occurred: "THE JUDGE: After sitting here a few minutes the juror states, words to the effect he 'liked his looks. I never could vote to convict this fellow.' . . . THE JUDGE: Your present state of mind is that even if the

evidence warranted conviction of murder in the first degree, you would not want to come to that? . THE JUROR: Yes, sir. THE JUDGE: You are excused. COUNSEL FOR THE DEFENDANT: Note my exception, he having been excused at this time, after having been drawn and accepted. THE JUDGE: I understand you now, that you now have an opinion with reference to the guilt or innocence of this defendant, is that correct? . THE JUROR: Yes. THE JUDGE: That would prevent you from arriving at a just decision? THE JUROR: Yes, sir. THE JUDGE: You want to make that known to the court before the jury is completed? THE JUROR: Yes, sir. THE JUDGE: You are excused. You may have your exception."

Thereafter, without further objection or exception, another juror was drawn in the place of Brown and the panel completed. The duty of the judge is, so far as possible, to see that a fair-minded, unbiased and unprejudiced jury is provided for the trial of a case. Where, before the panel is completed and the trial begun, it is brought to the attention of the judge by a statement of a juror himself that he will not return a verdict based on the evidence, it is manifestly the duty of the judge to excuse such juror. The record is not clear, but we assume that juror Brown had been sworn, as it is customary in first degree cases to administer the oath to each juror after he is accepted by both parties. *Commonwealth* v. *Ventura*, 294 Mass. 113, 116. The panel, however, had not been completed. In *Commonwealth* v. *Twombly*, a rape case, (cited in a footnote, 10 Pick. 477, 480) it appeared that after the twelfth juror was sworn, but before the jury was empanelled, juror number 5 was excused, because it was brought to the attention of the court, Shaw, C. J., Wilde, J., and Morton, J., sitting, that he was opposed to capital punishment except in the case of murder. We are concerned here not with limitations as to the time within which parties may be required to exercise their rights of peremptory challenge, see *Commonwealth* v. *Knapp*, 10 Pick. 477, 479, 480; *Sackett* v. *Ruder*, 152 Mass. 397, but with the voluntary action of the judge in providing for a disinterested jury. In our opinion the right of the

judge to excuse a juror for cause and to provide for the selection of another in his place continues at least until the jury is empanelled. The great weight of authority outside of this Commonwealth supports this view. *Webb* v. *State*, 100 Ala. 47. *Wesley* v. *State*, 65 Ga. 731. *Ochs* v. *People*, 124 Ill. 399. *State* v. *Duvall*, 135 La. 710, writ of error dismissed sub nomine *Duval* v. *State*, 239 U. S. 626. *Quay* v. *Duluth, South Shore & Atlantic Railway*, 153 Mich. 567. *Sullivan* v. *State*, 155 Miss. 629. *State* v. *Pritchard*, 16 Nev. 101. *People* v. *Damon*, 13 Wend. 351. *State* v. *Adair*, 66 N. C. 298. *Evans* v. *State*, 6 Tex. App. 513.

9 and 10. Assignments 9 and 10 refer to the admission of statements by one Colleran made about 10:30 P.M. on the evening of October 8 in Blanders Café in the presence of the defendant. A witness named Richards testified that Colleran and the defendant had "some kind of an argument over a glass of beer," that shortly thereafter Colleran said to the witness that "he wouldn't buy him [the defendant] a glass of beer if he never had a dime," and that the defendant who was a few feet away told him (Colleran) to keep quiet. There was no error in the admission of the statement by Colleran. With other evidence it had some slight bearing on the state of the defendant's finances. It was for the jury to say whether the defendant heard what Colleran said and what he meant by his alleged reply. *Commonwealth* v. *Simpson*, 300 Mass. 45, 51. See *Commonwealth* v. *Moore*, ante, 70, 77. It is to be noted that Richards had already testified without objection that he heard Colleran say to the defendant that "he wouldn't buy him a glass of beer" and that the defendant told him "to keep quiet."

11. Assignment 11 is based on the denial of a motion to strike out the testimony of Police Officer Norton as to his identification of the defendant. Norton testified that he did not see the face of the man running away from the vicinity of the crime but, when he saw the defendant's "particular" style of running in the station house, he believed that he was the same man seen by him (Norton) on Fottler Road. Because under cross-examination Norton finally said with

some degree of positiveness that he *was* the man, his previous statement of belief was not rendered inadmissible. The judge would not have been warranted in striking out the Norton testimony. It was evidence tending to identify the defendant with the assailant of Miss Rodman. *Commonwealth* v. *Cunningham,* 104 Mass. 545. *Commonwealth* v. *Williams,* 105 Mass. 62. *Commonwealth* v. *Sturtivant,* 117 Mass. 122. *Commonwealth* v. *Kennedy,* 170 Mass. 18, 24. *Commonwealth* v. *Sacco,* 255 Mass. 369, 388, 389.

12 and 13. A police officer, John F. Burke, testified as to certain talks with the defendant and that he investigated the movements of the defendant after October 8 around Dover Street, Boston, and in Connecticut. In testifying he held in his hand a small blue note book. It did not appear that he consulted any notes while testifying. He stated that there was printing in the book pertaining to the police department. After a conference at the bench, not recorded, the book was offered by the defendant and excluded. Assignments 12 and 13 refer to such exclusion. We have no means of knowing what was printed in the book. There was no offer of proof and no error in its exclusion. The notes of the witness were not excluded.

14 and 15. Assignments 14 and 15 refer to the admission of five photographs of the deceased. It is settled that such photographs may be admitted to show the jury the nature of the assault and the injuries received. *Commonwealth* v. *Retkovitz,* 222 Mass. 245, 248, 249. *Commonwealth* v. *Knowlton,* 265 Mass. 382, 386. *Commonwealth* v. *Osman,* 284 Mass. 421, 423.

16 to 23, inclusive. Assignments 16 (17 being waived), 18, 19, 20, 21, 22 and 23 refer to the testimony of Police Captain Graham as to statements in the nature of confessions made by the defendant. The testimony was first heard in the absence of the jury by the judge, who found as a preliminary fact that the statements were voluntary. Obviously the statements, if made voluntarily, were admissible, and it later became a question for the jury whether they were so made. This issue was submitted to the jury by the judge under appropriate instructions. *Commonwealth* v.

*Sego,* 125 Mass. 210, 213. *Commonwealth* v. *Preece,* 140 Mass. 276. *Commonwealth* v. *Dascalakis,* 243 Mass. 519, 522. *Commonwealth* v. *Buck,* 285 Mass. 41, 47.

24 and 25. Assignments 24 and 25 refer to the record of the defendant's statements made in response to questions by Officer Wilson recorded by stenographers Burke and Stapleton and read from their notes. After a hearing in the absence of the jury the judge found these statements to have been made voluntarily and later submitted the evidence under proper instructions to the jury. There was no error.

26. Assignment 26 refers to a question to Captain Graham in cross-examination. He was asked: "Were you ordered or was it suggested or were you requested to search for two escapees from the insane institution?" It was properly excluded, there being no indication of its materiality. See *Commonwealth* v. *Murphy,* 282 Mass. 593, 597.

27. As to assignment 27: When Mrs. Galvin, the mother of the defendant, was on the witness stand she was asked by counsel for the defendant to relate a conversation with one Walker, a police officer, about an assault on the defendant when he was a boy. Walker was not a witness, and after a conference at the bench, not reported, the inquiry was excluded apparently because of its hearsay character. There was no error.

28. Assignment 28 refers to the admission of questions to the defendant on cross-examination. The district attorney was inquiring as to the real reason why the defendant confessed to the assault on Miss Rodman. He asked: "Now, Mr. Galvin, it is a fact, is it not, that you decided to tell what you knew about this when Sergeant Norton identified you as the man he chased from the scene of the slugging?" The defendant answered: "No, sir." The district attorney then asked: "Sergeant Norton did state in your presence, with a stenographer present, pointing to you, 'He is the man I saw at the scene of the slugging on October 8?'" To this inquiry an exception was taken. The defendant answered: "Not to my knowledge." The cross-examination was proper as the defendant had testified that

he had been induced to make untrue statements of fact under the fear of physical abuse by the police.

29 to 32, inclusive. Assignments 29, 30, 31 and 32 refer to questions to the defendant as to his knowledge of police routine in connection with his actions and statements while under arrest. The examination was proper and no attempt was made to introduce evidence of other offences committed by the defendant. The defendant himself had testified to previous personal experiences while under arrest.

33. Assignment 33 refers to the admissibility of evidence, offered by the Commonwealth in rebuttal, that while interrogating the defendant Captain Graham said to him: "And you killed the woman for three lousy dollars." There was evidence that, following this incident, in reply to questions of Officer Wilson the defendant admitted "shouldering" the woman and taking her handbag. The defendant had testified that when he made these admissions he did not know that the woman had died. The statement of Captain Graham was admissible to rebut the truth of this testimony. The jury were instructed by the judge that the statement of Captain Graham was admitted not as evidence that the defendant killed the woman but "solely on the question of knowledge of the defendant," that, when being interrogated by Wilson, he knew he was accused of the murder of Miss Rodman. There was no error.

34. The motion for a directed verdict of not guilty was properly denied. There was a clear issue of fact for the jury. It was for them to say whether the defendant made the statements attributed to him and, if he did, whether such statements were true. If true, the jury were justified in finding that the woman he said was "shouldered" by him on Fottler Road was Miss Rodman and that to obtain her handbag he committed a brutal assault upon her, resulting in her death. The crime could be found to constitute murder in the first degree, either because committed in the commission of a robbery, a crime punishable with imprisonment for life, or with deliberately premeditated malice aforethought. G. L. (Ter. Ed.) c. 265, § 1; § 17, as appearing in St. 1943, c. 250, § 1; § 19.

35 to 39, inclusive. Two motions for a new trial filed by the defendant on November 2, 1946, and September 19, 1947, were denied after hearing. The first motion alleged the discovery of new evidence and that the verdict was against the evidence, the law, and the weight of the evidence. It also contained allegations concerning errors alleged to have been committed during the trial of the case without reservation of exceptions. The second motion was based on newly discovered evidence. At the hearing on the first motion oral testimony was introduced. There was evidence tending to show that the witness who testified at the trial that he had lent money to the defendant on the morning of October 8, 1945, was mistaken. St. Onge, the motorman on the street car in which the defendant rode to Boston on the night of the murder, who was not a witness at the trial, was called and testified that the defendant boarded the car at 10:57 or 10:58 P.M., coming from the direction of Blanders Café, and that he observed nothing unusual about the defendant or his clothing. The second motion concerned the medical history of the defendant and was supported by affidavit to which were attached (1) a copy of a clinical summary of the defendant's hospitalization on December 11, 1940, at the Pilgrim State Hospital on Long Island, New York, (2) a copy of the record of the defendant's employment at Beth Abraham Home for Incurables, New York city, between October 10 and 22, 1945, and (3) a copy of the record of hospitalization of the defendant at Bellevue Hospital, New York city, October 20 and 21, 1945. Between the hearings on these two motions the judge, after hearing, denied a motion for a rehearing on the first motion for a new trial. At this hearing and on the subsequent hearing on the second motion for a new trial the defendant filed requests for findings of fact and requests identical in form for rulings of law. At both hearings the judge refused to make findings of fact, and refused requested rulings of law which were as follows: "1. On all the evidence this motion must be granted as a matter of law. 2. To deny this motion on all the evidence would be an abuse of judicial discretion. . . . 6. In passing upon this motion the

test is, might honest and intelligent men reasonably differ as to the ultimate conclusion to be drawn from the new evidence taken in connection with the old evidence. 7. To deny this motion and refuse a new trial on the facts not in dispute at the hearing of the present motion would be to deprive the defendant of liberty and life without due process of law in violation of the Fourteenth Amendment to the Constitution of the United States." The defendant filed exceptions to the findings, rulings, decisions and order of the judge on these motions.

At the hearing on the second motion for a new trial the defendant saved an exception to the refusal of the judge to admit in evidence the copies of the medical records which were attached to the affidavit of the defendant's counsel. Assignments of error 35, 36, 37, 38 and 39 relate to these exceptions. In our opinion the evidence offered at the hearings was not of such a character as "to afford a probability that it would be a real factor with the jury in reaching a decision." *Davis* v. *Boston Elevated Railway*, 235 Mass. 482, 496. Whether the defendant was without money on the morning of October 8, 1945, was a fact remote from his financial condition late in the same evening after, as he testified, he had been spending much of the day drinking at cafés. The testimony of the motorman St. Onge did not affect the vital question as to what the defendant did between the time he left Blanders Café and the time he boarded the street car.

At the trial no contention was made that the defendant was insane, and the medical records were not offered at the hearing on the second motion for a new trial in support of such a contention. The defendant's offer was to show that he was a chronic alcoholic and a victim of alcoholic psychosis and pathological intoxication. It is difficult to see how such evidence would be admissible at a trial except in supplementing evidence of insanity. *Commonwealth* v. *Rogers*, 7 Met. 500. *Commonwealth* v. *Johnson*, 188 Mass. 382. *Commonwealth* v. *Cooper*, 219 Mass. 1. *Commonwealth* v. *Stewart*, 255 Mass. 9. There is nothing to the exception taken to the refusal of the judge to admit the records them-

selves as evidence. Their contents were fully set out in the affidavit by counsel attached to the motion. See *Soebel* v.: *Boston Elevated Railway*, 197 Mass. 46, 50–52. Without passing on the admissibility of records of this character in a criminal case under G. L. (Ter. Ed.) c. 233, § 79, as amended by St. 1946, c. 473, § 1, the records here were not admissible for it was not shown that the hospitals concerned came within any of the designated classifications of G. L. (Ter. Ed.) c. 111, § 70, as amended by St. 1945, c. 291. *Clark* v. *Beacon Oil Co.* 271 Mass. 27. *Sullivan* v. *Morse,* 271 Mass. 501, 503. *Karpowicz* v. *Manasas,* 275 Mass. 413, 419.

As to the questions of law which might have been raised at the trial, referred to in the first motion, the judge might as matter of discretion permit them to be raised on a motion for a new trial, but the defendant cannot demand this as a matter of right. *Ryan* v. *Hickey,* 240 Mass. 46. *Commonwealth* v. *Dascalakis,* 246 Mass. 12. *Commonwealth* v. *McKnight,* 289 Mass. 530, 544. The judge was not required to make findings of fact. *Davis* v. *Boston Elevated Railway,* 235 Mass. 482, 494. *Commonwealth* v. *Dascalakis,* 246 Mass. 12, 25. It is settled that the allowance of motions for a new trial depends upon the wise exercise of discretion by the judge. Clearly there was no abuse of judicial discretion here. The requests for rulings of law were properly denied. They were not accurate statements of the law. *Davis* v. *Boston Elevated Railway,* 235 Mass. 482. No error is disclosed in connection with any of these assignments.

In accordance with the mandate of G. L. (Ter. Ed.) c. 278, § 33E, as amended by St. 1939, c. 341, we have considered the law and the evidence in the case and are satisfied that no reason exists for requiring a new trial.

*Judgment affirmed.*