Borenstein, J.
On November 21, 1991, a Suffolk County grand jury returned indictment numbers 91-24141-001 and 91-25141-002 against Tarahn Harris for murder in the first degree. The defendant has moved to dismiss the indictments on two grounds. The defendant primarily argues that the integrity of the grand jury proceedings was impaired by the false and deceptive presentation of evidence to the grand jurors, thus the indictments should be dismissed under Commonwealth v. O’Dell, 392 Mass. 445 (1984). In addition, the defendant moves for dismissal of the indictments under Commonwealth v. McCarthy, 385 Mass. 160 (1982), arguing that the evidence presented to the grand jury was insufficient to establish probable cause. The Commonwealth opposes dismissal. For the reasons set forth below, the defendant’s motion is allowed, and all indictments are dismissed without prejudice, and the Commonwealth, in its discretion, may seek to reindict the defendant.
BACKGROUND
On the evening of April 20, 1991, two young boys, Korey Grant and Charles Copney, were shot in front of 27 Highland Avenue in Roxbury. Shortly after they were taken to Boston City Hospital, both boys were pronounced dead, due to the gunshot wounds.
On that same evening, Boston Police homicide detectives, including Officer Herbert Spellman, spoke to other young people who were present at the scene of the shooting, and later obtained arrest warrants for Damien Bynoe, Willie Dunn and Tarahn Harris. The information provided to the police indicated that Damien Bynoe had allegedly been the one who shot the boys.
At some point during the evening of April 20, 1991 and the early morning hours of April 21, 1991, Bynoe, Dunn and Harris were arrested at their homes and taken down to the Boston Police Department (BPD) Area B-2 Homicide Unit. Another young man, Wayne Hogan, was already in the juvenile holding cell, having been previously arrested for an unrelated matter.
During the early morning hours of April 21, 1991, Damien Bynoe was placed in the juvenile holding cell with Wayne Hogan. Hogan apparently initiated a conversation during which Bynoe made some statements to Hogan about the shooting incident. Approximately an hour and a half to two hours later, Willie Dunn and Tarahn Harris were placed in the same holding cell. There was some more talk of the shooting incident. At some point Bynoe fell asleep, and Dunn and Harris had some discussion about the shooting incident, also in Hogan’s presence. During the time they were at the Area B-2 station, Dunn and Harris also gave separate statements about the shooting to Officer Spellman.
*412 On April 22, 1991, Wayne Hogan approached a BPD officer, at the Roxbury District Court. Hogan, who was accompanied by his father at court, said he had overheard statements about the Grant/Copney shooting while in the holding cell. He then gave a statement to the police officer. In his statement, Hogan referred to Damien Bynoe by his own name, however, Hogan referred to Dunn and Harris as “Well Built” and “Slim.” This statement was forwarded to Officer Spellman.
A probable cause hearing was held on several dates between May 15, 1991 and June 6, 1991, at the Roxbuiy District Court Juvenile Session. This hearing comprised “Part A” of transfer proceedings against Tarahn Harris. Several prosecution witnesses testified at this hearing, including Steven Pam, a boy who had bicycled by Bynoe, Dunn and Harris just prior to the shooting on April 20, 1991. Wayne Hogan, the young man who had shared the Area B-2 juvenile holding cell with Bynoe, Dunn and Harris on the evening of April 20, 1991 to April 21, 1991 also testified.
On October 8, 1991, at the conclusion of the transfer proceedings, the juvenile complaints against Tar-ahn Harris were dismissed, adult complaints were issued, and Harris’s adult complaints were bound over, so that indictments could be sought from the Suffolk County grand jury.
On November 20, 1991, the grand jury heard evidence against Harris, as described below. Officer Spellman, the only adult witness to testify, was the prosecution’s primary witness. Steve Pam, the boy on the bicycle; Elijah Canty, another youth present at the scene of the shooting; and Wayne Hogan were the other witnesses presented to the grand jury. The murder indictments against Tarahn Harris were returned on November 21, 1991.
FINDINGS OF FACT
After reviewing the evidence presented to the grand jury, I find that the integrity of the grand jury proceedings was impaired by the misleading, distorted, reckless and knowingly false presentation of evidence against Tarahn Harris, for the purpose of procuring the indictments, and that it is highly probable that the grand jury’s decision to return indictments against Tarahn Harris was based on this seriously tainted evidence. I also make the following findings of fact.
1.At the grand jury hearing held on November 20, 1991, referring to a statement taken from Willie Dunn, Officer Spellman told the grand jury that Damien Bynoe had “produced a firearm on the bus, as they [Bynoe, Dunn and Harris] were taking the bus to go up to Highland.” (Grand Jury Transcript, hereinafter g.j., p.3.) However, in Harris’s April 21,1991 statement to the Boston Police, made in the presence of Officer Spellman, Harris stated that he did take a bus with Bynoe and Dunn, although he said nothing about a gun being produced on the bus (Harris, p.4), and he maintained that he in fact never saw the gun on the evening of the shootings (Harris, p.9).
I find that Spellman’s statement was reckless and misleading as to Harris, because Spellman’s testimony about Dunn’s alleged statement that he had seen a gun on the bus probably led the grand jurors into assuming that all three boys had seen a gun on the bus. Officer Spellman knew that Harris had made no statement about seeing a gun on the bus, and that in fact Harris had denied seeing a gun at all on the night of the shooting. Nevertheless, Officer Spellman disregarded this, and instead only represented to the grand jury that Harris shared knowledge of the gun and the intent to use it.
2. In the midst of informing the grand jury of the statement which Harris made to the police on April 21, 1991, Spellman said, “Steven Pam was riding a bike. Steven Pam was coming out of Highland on Centre Street when Damien Bynoe attempted to take the firearm out and shoot Steven Pam.” (G.j., p.4.) However, in his statement to the police, Harris makes no mention of a boy on a bike. (Harris, p.6.) In addition, at the probable cause hearing held at the Roxbury District Court, (hereinafter, p.c.), Steve Pam did not testify that he had seen a gun, nor did he testify that Bynoe had attempted to shoot him. Prior to the grand jury hearing, Pam had only stated that he saw Bynoe make a movement with his hands in the area of his waist. (Pam, p.c., p.2-134.)[1]
I find that Officer Spellman knowingly provided false testimony to the grand jury when he stated that Bynoe “attempted to take the firearm out and shoot Steven Pam,” when up to that point, Pam had only stated that he had seen Bynoe make a movement of his hands to his waist area, without any claim of an attempt on his life or even having seen a gun.
In addition, I find that Officer Spellman recklessly distorted the evidence and misled the grand jurors by first testifying about Harris’s statement to the police and then switching midstream to the statement claimed to have been made by Pam. In so doing, Spellman attributed to Harris knowledge of the gun and intent to use it, even though Spellman knew Harris’s statement to the police included no such remarks.
3. Continuing to relate this distorted version of Harris’s statement, Officer Spellman testified to the grand jury that “Willie Dunn said, No, that’s Stevie. He’s okay.” (G.j. p.4.) At the probable cause hearing, referring to statements made by Bynoe in the holding cell, Wayne Hogan testified that, “Damien was going to shoot the dude on the bike, but the other two boys was like, no, no, it’s such and such.” (P.c., p. 2-170.)
I find that Spellman continued to recklessly and grossly distort Harris’s statement to the police, thereby assigning to Harris statements which he had not made and knowledge which he may not have had. Harris never told the police that he had heard Dunn say “No, that’s Stevie.” In addition, where Wayne *413 Hogan had not specified who made the statement, Spellman saw fit to name Willie Dunn.
I do however find that the grand jurors could reasonably have inferred that Harris may have heard this statement, and thus may have had some knowledge that Bynoe had made some type of gesture, or had the capacity to cause harm, or was in the possession of some type of weapon. I do not find that the grand jurors could have reasonably inferred from Harris’s possible hearing of the statement that he participated in a joint venture to murder.
4. Officer Spellman next stated to the grand jury that Steven Pam, “knew about the fight, and he knew from talking to Damien Bynoe’s brother the day before, that the boys from Orchard Park, including Damien, were coming to Highland strapped. Strapped on the street means that they were going to cany firearm.” (G.j. p.4-5.)
I find that this statement made by Officer Spellman was highly prejudicial hearsay upon hearsay which the government had an obligation to limit or clarify. This rumor was allegedly initiated by Damien Bynoe, however it was intentionally used by Spellman and left undisturbed by the government, in order to convince the grand jury that Harris was a joint venturer and had prior knowledge of a plan to cany a gun and use it.
5. Officer Spellman testified before the grand jury that, “After the shooting, they ran down the street, the three boys, Bynoe, Dunn and Harris.” (G.j., p.5.) However, at the probable cause hearing, referring to what Dunn and Harris had said in the holding cell, Wayne Hogan said, “They didn’t have the gun at all. And they said, one of them said that he first started shooting he had ran .. .” (Hogan, p.2-171.) Moreover, when Officer Spellman took Harris’s statement on April 21, 1991, Harris gave a detailed description of the route he had taken as he ran from the scene of the shooting. Harris explicitly stated that he had left the Highland Street area by himself, and then ran into Dunn. (Harris, pp.7-10.)
I find that Officer Spellman had no evidence that all three boys had fled the scene of the shooting together. I further find that Officer Spellman falsely testified, at best knowingly and recklessly, and at worst deceptively, in order to mislead the grand jury into concluding that the three boys had acted in concert on the night of April 20, 1991.
6. Continuing to relate on his version of Harris’s statement to the police, Officer Spellman testified to the grand jury that, “Harris and Dunn went to the Mission Hill Projects and from there they went down the pizza parlor by Northeastern University where they discussed the incident... [After pizza] they then went back to Damien Bynoe’s house and discussed the incident.” (G.j., p.5.)
However, in the actual statement which Harris made to Spellman and other officers on April 21, 1991, Harris described his conversation with Dunn as, “We was just talking about how we was a part of that shooting, not the point that, eh, at that point we didn’t know anybody got hit. We just was surprised that he just started shooting period." (Harris, p.10.) In addition, when describing to the police the conversation at Bynoe’s house, Harris stated, “And then we walked over, and then we walked over to Damien’s house and he was there, and we was like. I asked him why he did it, because he just did it, and so he was just like, ‘I think I got somebody.’ And we was like we think you did too, cause we seen a whole bunch of ambulances ...” (Harris, p. 12.)
I find that Officer Spellman knowingly and intentionally mischaracterized Harris’s statement to the police by testifying to the grand jury that the defendants had seemingly coofy “discussed” the shooting. Spellman was one of the officers who took Harris’s statement, in which he described his confusion and surprise over the shooting. In misrepresenting Harris’s statement to the police and the aftermath of the shooting, Spellman continued to deceptively present the grand jury with a picture that Harris participated in a joint venture which resulted in the murder of the two boys on Highland Avenue, and that Harris then met with his joint venturers after the fact, to discuss the success of their joint effort.
7. Spellman continued, ‘They had a conversation there ... Damien Bynoe said, “We have to get rid of the gun.’ ” (G.j., p.s.) However, Harris’s statement to the police reflects that Bynoe had already hidden the gun by the time he met Harris and Dunn at his house. Spellman did not explain this to the grand jury. Bynoe had said that he had thrown the gun down near Jackson Square, as he fled from the scene of the shooting. Bynoe alone knew where he had left the gun, and he alone was going back to retrieve and dispose of the gun. (Harris, pp. 12-14.) In addition, according to Wayne Hogan’s statement to the police, Bynoe had acted independently in instructing his own little brother to get rid of the bullets and do something with the gun. (Hogan, p. 1.)
I find that Spellman knowingly and recklessly, if not falsely, “created” this evidence in order to mislead the grand jury into believing that, after the shooting took place, Harris continued to participate in a joint effort which included a plan to conceal or destroy incriminating evidence.
8. Referring now to the statement which Wayne Hogan gave to the police concerning what he overheard in the holding cell, Spellman testified before the grand jury that, “Bynoe tells him [Hogan] how he had taken the gun and gone out to Highland and he shot the boys.” (G.j., p.6.) However, the memorandum of Hogan’s actual statement to the police reflects that, “Damien said that he told ‘the dude to move’ but he *414 didn’t so he started shooting, ‘didn’t mean to shoot the little dude but he got in the way.’ Damien went on to say, ‘he shouldn’t have brought the gun, we should have just jumped them.’ ’’ (Hogan, p.l.)
I find that Officer Spellman deliberately misrepresented the evidence, in order to give the grand jury the impression that Bynoe had taken a gun to Highland Avenue, intending to shoot at some of the boys on Highland Avenue. Because Spellman consistently distorted and attributed the evidence against Bynoe to Harris as well, I find that Spellman intentionally distorted the evidence against Harris, leading the grand jury to believe that Harris knew Bynoe was planning to use the gun.
9.After explaining how Dunn and Harris joined Bynoe and Hogan in the holding cell, Officer Spellman, referring to Hogan’s statement to the police, testified that, “They [Dunn and Harris] repeat the same stories, and they tell this other juvenile, Wayne Hogan, about how the incident went down, how they had the gun . . .’’ (G.j., p.7.)
However, in his April 22, 1991 statement to the police, Hogan did not say that “Slim” and “Well Built,” his apparent references to Harris and Dunn, repeated Bynoe’s version of the incident or that they had a gun. Hogan reported to the police that “Slim" said, “I had a funny feeling we were going to get caught, and after I saw it on T.V. I knew we were going to get caught,” and “we never should have brought the gun.” Hogan also told the police that “Well Built” said, “I didn’t have anything to do with it, I thought Damien was going to fire the gun in the air,” and “I thought we were just going to beat them up.” In addition, at the probable cause hearing, Hogan testified about Dunn and Harris that, “the other two dudes was talking about that, you know that they didn’t shoot. They were saying that they didn’t, you know, shoot, that they didn’t hit nobody. They didn’t have the gun at all.” (P.c., p.2-171.)
I find that Officer Spellman knowingly misstated the evidence provided by Wayne Hogan, by testifying that Harris and Dunn repeated the substance of Bynoe’s supposed remarks to Hogan, which, as discussed above, Spellman also misrepresented. Hogan’s account to the police of what he overheard in the juvenile holding cell clearly distinguished the nature of comments made by Bynoe from that of the remarks made by Harris.
Moreover, Spellman seriously distorted the evidence when he notated that “they had the gun,” where it is abundantly clear from the Harris, Dunn and Hogan police statements that only Bynoe had possession and control of the gun. In so doing, Spellman knowingly and intentionally imputed to Harris possession of the gun and an intention to use it, despite the fact that the evidence procured by Spellman himself indicated neither.
10. Referring still to what “Slim” and “Well Built” said to Wayne Hogan in the holding cell, Officer Spell-man testified that Hogan told him that the boys had said “how they were going up to take care of business from Orchard Park up to Highland where they went up and shot the boys.” (G.j., p.7.)
I find that this last statement by Officer Spellman was an egregious fabrication of evidence. Neither Hogan’s initial statement to the police nor Hogan’s testimony at the probable cause hearing make any mention whatsoever of any remark which is even remotely similar to the “take care of business” statement testified to by Officer Spellman.
Moreover, throughout his testimony to the grand jury, Spellman consistently used the word “they” in an effort to mislead the grand jury into believing that Bynoe, Dunn and Harris collectively participated in a plan to take a gun and shoot some Highland Avenue youths.
To the contrary, in his statement to the police, Harris explained that, “. . . [m]e and Will met up with Damien as we was walking, we was just walking . . . He [Damien], eh, he asked me would I take a walk with him up Highland Street, so, eh he could see what was going. Cause, I guess, he had a beef up there.” (Harris, p.5.) Unlike the picture painted by Spellman for the grand jury, Harris’s statement to the police gives the impression that he and Dunn coincidentally ran into Bynoe, who unexpectedly asked them to accompany him to Highland Avenue.
11. Officer Spellman also testified to the grand jury how Wayne Hogan had related that “During the conversation in the holding area, they talked about how there was a woman witness and they had to go and get rid of her, and they had to get rid of Steven Pam, the kid that was on the bike.” (G.j., p. 7.) However, in his statement to the police, Wayne Hogan said that, “Damien then said that they had to get rid of the kid on the bike. He’s the one who told. And that they should get the lady in the car, with her boyfriend. He states that he’s seen her around and can find out who she is.” (Hogan, p.l.) Moreover, at the probable cause hearing, Hogan, referring to statements overheard in the holding cell, said, “And then he [Damien] said there was a lady in the car, I think a white car with her boyfriend, and they said that the boy on the bike and the lady in the car and her boyfriend had seen what happened. And they said, Damien said, that he was going to get, you know, the dude on the bike, and the lady in the car were the witnesses.” (P.c., p. 2-170-2-171.) Wayne Hogan never said that Tarahn Harris had stated that he was going to get rid of witnesses.
I find that Officer Spellman’s use of the word “they” to describe statements which he knew had only allegedly been made by Bynoe was a knowing, intentional and seriously misleading statement of evidence. I find that Spellman knowingly attributed to Harris statements about eliminating witnesses, in a continued *415 effort to mislead and deceive the grand jury into concluding that all three boys shared equal responsibility for the shooting, and that they continued to act jointly, and demonstrate a joint consciousness of guilt as they plotted to kill eyewitnesses.
12. Officer Spellman testified about the alleged facts surrounding the shooting, by informing the grand jury that he had taken a statement from Tarahn Harris, and then beginning with, “He tells us that...” as if he were recounting Harris’s statement to the police. (G.j., pp.4-6; see also, para. nos. 2, 3, 5, 6 and 7 above.) Officer Spellman also testified about statements made by Harris when he told the grand jury about the discussion between Dunn and Harris in the holding cell. (G.j., pp.6-7; see also para. nos. 9 , 10 and 11 above.) .
As detailed above, Officer Spellman misled the grand jurors into believing that Harris had made or adopted a number of highly incriminating statements. However, based on Spellman’s testimony, the grand jury was never informed that Harris ever made any exculpatory statements, such as “We just surprised that he just started shooting period,” (Harris, p.10), and, “I asked him [Bynoe] why he did it, because he just did it . . .” (Harris, p. 12.) Moreover, as detailed above, Spellman never told the grand jury about the portions of Harris’s statement which reflect that he had not planned to go to Highland Avenue prior to being asked by Bynoe, that he never saw or possessed a gun, and that it was only as a result of hearing ambulances and news reports, that he learned of people actually being shot.
I find that Spellman’s omission of any of Harris’s exculpatory statements was not merely negligent or sloppy testimony. Rather, I find that Officer Spellman intentionally distorted Harris’s overall statement to the police in order to present the grand jury with a manipulated image of Harris as a knowing participant in the murders.
13. Steven Pam testified to the grand jury that after he heard the gun shots on the evening of April 20, 1991, that he heard the cry, “O.P. Trailblazers." (G.j., p. 15.) This was a reference to a group of young people from Orchard Park, the area where Bynoe, Dunn and Harris lived. In the presence of the grand jury, Pam was asked if he recognized who had yelled “O.P. Trailblazers.” Pam testified that it “sounded like Willie [Dunn] and Tarahn [Harris].” Pam was asked by Phillip Beauchesne, the prosecutor, “And you’ve heard their voices before?” and Pam testified that he did. However, in his prior statement to the police, Pam said that the voices sounded like “Willie [Dunn] and Damien [Bynoe]” (Pam, p.8,) and at the probable cause hearing he testified that “It sounded like Damien or Willie.” (P.c., p.2-73.)
I find that Steve Pam mistakenly testified in front of the grand jury that Harris was one of the people who had screamed “O.P. Trailblazers," just after the shooting on April 20, 1991. Twice before, in his statement to the police, and at the probable cause hearing, Pam had identified the source of the cry, never claiming to recognize it as Harris’s voice.
I find that the fact that Mr. Beauchesne failed to ask this twelve-year-old witness whether he meant to say Bynoe and/or Dunn was a reckless use of a gratuitous mistake which was left unrectified, as part of pro-secutorial effort to indiscriminately spread culpability amongst Bynoe, Dunn and Harris, in order to indict all three suspects. I further find that, to the extent that Pam’s testimony on this issue tended to corroborate Officer Spellman’s distorted account of the events, it probably influenced the grand jury in its decision to indict Tarahn Harris.
14.1 further find that the prosecutor failed to clarify to the grand juiy who “Slim” and “Well Built” actually referred to, in reckless disregard of the fact that the grand jury was trying to sort out the evidence presented as it related to each of the three defendants.
15. Moreover, I find that the prosecutor knowingly allowed Officer Spellman to grossly distort and fabricate the evidence being presented to the grand jury, in order to obtain indictments against Tarahn Harris.
DISCUSSION
A court will not generally inquire into the competency or sufficiency of the evidence presented to a grand jury. Commonwealth v. Robinson, 373 Mass. 591, 592 (1977); Commonwealth v. Galvin, 323 Mass. 205, 211-12 (1948). However, despite this general rule, a court may properly review the evidence presented to the grand jury, to determine whether the grand jury heard sufficient evidence to find probable cause for arrest, or whether the integrity of the grand jury proceedings were impaired. Commonwealth v. Reddington, 395 Mass. 315, 319 (1985); Commonwealth v. McGahee, 393 Mass. 743, 746-47 (1985).
Dismissal of an indictment is warranted by a grand jury’s failure to hear evidence which, at the very least, is sufficient to establish the identity of the accused and probable cause to arrest him or her. Commonwealth v. McCarthy, 385 Mass. 160, 163 (1982) (indictment dismissed, grand jury heard no evidence of criminal involvement by defendant). Alternatively, a court should dismiss an indictment where it determines that the integrity of the grand jury proceedings was impaired by the unfair, misleading or distorted presentation of evidence to the grand jurors. Commonwealth v. O’Dell, 392 Mass. 445, 446-47 (1984) (indictment dismissed, unfair and misleading presentation of defendant’s statement, excluding exculpatory portion, seriously tainted integrity of grand jury proceeding). See also, Commonwealth v. Salman, 387 Mass. 160, 167 (1982) (if it becomes known to the prosecution that knowingly false testimony was used to procure indictments, prosecutor has duty to advise court and dismiss indictments).
*416 Where, as in the present case, the defendant claims that the integrity of the grand jury proceedings was impaired, the defendant must show that 1) the misleading, false or deceptive evidence was given to the grand jury knowingly or with a reckless disregard of the truth, 2) that the evidence in question was so presented for the purpose of obtaining an indictment, and 3) that the evidence in question “probably influenced” or “probably made a difference” in the grand jury’s decision to return an indictment. Commonwealth v. Mayfield, 398 Mass. 615, 621-22 (1986).
Dismissal of indictments under these circumstances is necessary to ensure that the “grand jury’s historic function as an investigative and accusatory body” is not interfered with, O’Dell, supra at 450, and to protect the grand jury’s “traditional function as an effective protection ‘against unfounded criminal prosecutions.’ ” McCarthy, supra at 163.
In the present case, the defendant has met his burden under O’Dell and Mayfield.[2] The defendant has shown that Officer Spellman, the primary witness before the grand jury, knowingly and intentionally falsified, recklessly fabricated, distorted, misled and deceived the grand jury. The defendant has also demonstrated that Spellman knowingly distorted Harris’s statement, by suggesting to the grand jury that Harris made incriminating remarks, while failing to inform the grand jury that Harris actually made exculpatory statements as well. By knowingly distorting Harris’s statement to the police and omitting exculpatory statements, it is very likely that “the grand jurors, being untrained in the law and uninformed that the defendant had denied having knowledge,” of Bynoe’s alleged criminal intent, “incorrectly interpreted the defendant’s statement as a [statement] that he was a willing participant in the crime.” O’Dell, supra at 449.
In addition, I am convinced that Officer Spellman knowingly falsified and distorted the evidence against Tarahn Harris, and that the prosecutor, Mr. Beauchesne, intentionally took advantage of this. This was not a case of merely negligent or overzealous prosecution. This is a case where the police and prosecutor knowingly distorted the evidence to secure indictments against Tarahn Harris. Officer Spellman and Mr. Beauchesne presented the evidence in this manner to the grand juiy intentionally, for the purpose of strengthening what appeared to be a weak case against Tarahn Harris.
Finally, I am satisfied that the false and distorted manner in which the evidence against Tarahn Harris was presented "probably influenced” and “probably made a difference” in the grand jurors’ decision to return murder indictments against Tarahn Harris. Indeed, it is highly likely that, had the evidence been presented in a fair and honest manner, the grand jury might not have returned murder indictments.
ORDER
For the reasons stated above, it is ORDERED that indictments # SUCR91-25141-001 through 004 are hereby DISMISSED without prejudice.

 Steven Pam testified at the grand jury hearing after Officer Spellman. Steven Pam’s testimony before the grand jury was significantly different from his testimony at the probable cause hearing. When asked at the grand jury hearing, “Did you see anything that appeared to be a gun on him [Bynoe]?” Pam replied, “It looked like the handle of a pistol.” (G.j., p. 13.)

 It is therefore not necessary to discuss, under McCarthy, the sufficiency of the evidence presented to the grand jury. O’Dell, supra, at 450. However, it does not appear that the grand jury heard sufficient untainted evidence to support murder indictments against Tarahn Harris.