COMMONWEALTH *vs.* ROCCO A. BALLIRO & others.

Suffolk. May 3, 1965. — July 2, 1965.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & KIRK, JJ.

*Homicide. Breaking and Entering. Constitutional Law,* Access to witnesses, Due process of law. *Practice, Criminal,* Access to witnesses, Disclosure of evidence before grand jury.

Verdicts of guilty against three defendants upon indictments for breaking and entering a dwelling house in the night time with the intent to commit an assault by means of a dangerous weapon and committing that assault and for murders in the first degree of a woman and her young son were warranted by evidence that one defendant, an escapee from jail who had been living with the woman, although she was married to another, twice followed her husband and stopped him and two other men and engaged in altercations with them, and that later the escapee and the two other defendants, all armed, broke open the door of an apartment in which the woman and her son were present and "came in . . . shooting and yelling," whereupon a gunfight ensued with police officers there in the course of which the woman and her son were shot and killed by the escapee. [510–511]

Three men who, while armed with revolvers, perpetrated a felony punishable by life imprisonment, in the course of which a gunfight with police occurred and two persons present were shot and killed, could not be found guilty of murder if the two victims were killed by police gunfire rather than by gunfire of any of the three men. [511, 515]

Under art. 12 of the Declaration of Rights of the Constitution of Massachusetts, a defendant in a criminal case should be accorded, as of right, an opportunity to interview a material witness held in seclusion in the custody of the Commonwealth. [516–517]

An unconditional denial of pre-trial motions of defendants indicted for serious crimes, that they be afforded an opportunity to interview material witnesses secluded in the custody of the Commonwealth, constituted a violation of the defendants' rights under art. 12 of the Declaration of Rights of the Massachusetts Constitution and prejudicial error which tainted convictions of the defendants, even though they did not show how the desired interview of the witnesses would have aided the defence. [515–516, 518]

There was no error in a criminal case in the denial of the defendant's motion to be furnished with a copy of the minutes of the grand jury. [518]

INDICTMENTS found and returned in the Superior Court on February 6, 1963.

Certain motions were denied by *Donahue,* J., and *Lurie,* J.   The cases were tried before *Lurie,* J.

*Joseph J. Balliro* for Salvatore J. Balliro.

*Neil Colicchio* for Rocco A. Balliro.

*James W. Kelleher* (*William C. Madden* with him) for Albert P. Ciocco.

*Angelo Morello,* Assistant District Attorney (*Paul F. Cavanaugh,* Legal Assistant to the District Attorney, with him), for the Commonwealth.

SPALDING, J.   The defendants, Rocco A. Balliro (Rocco), Salvatore J. Balliro (Salvatore) and Albert P. Ciocco (Ciocco) were indicted for the murders of Toby Wagner and her young son, Mark.   The indictments charged murder in the first degree.   The defendants were also charged with breaking and entering a dwelling house in the night time with the intent to commit an assault by means of a dangerous weapon and with committing that assault.   G. L. c. 266, § 14.   The jury returned verdicts of guilty against the three defendants on both murder indictments and recommended that death sentences be not imposed.   See G. L. c. 265, § 2.   The defendants were also found guilty under the "breaking and entering" indictment.   The cases having been tried subject to G. L. c. 278, §§ 33A–33G, come here on the appeals of all of the defendants.

The jury could have found the following facts: Rocco met Toby Wagner (Toby) in July, 1962, at a café in Boston.   Thereafter he lived with her and her two children, Mark and Bernice Wagner, until November 29, 1962, when he was arrested in North Attleboro.   He was subsequently incarcerated in the New Bedford House of Correction where from time to time Toby visited him.   During the course of these visits, she took him four hacksaw blades.   Toby would write to him "almost every day."   In January, 1963, Rocco escaped from jail, and thereafter he and Toby and her two children lived together in an apartment in Chelsea.

On February 1, 1963, Toby told Rocco that her husband, Bernard Wagner, had been discharged from the Concord

Reformatory that morning. She left the apartment about 2:30 P.M., stating that she was going to see her husband in order to discuss a divorce.

Becoming anxious when Toby had not returned by 6:30 P.M., Rocco went to the home of a friend of Toby to inquire as to her whereabouts. He told the friend that he was supposed to meet Toby and that they were going away together. He was worried because he could not find her. Shortly after this conversation, Rocco went to the apartment of Toby's sister-in-law, Mary Adams, at 107 Centre Street, Roxbury. He knocked on the door, but there was no response. He could hear Bernice Wagner crying inside the apartment, so he smashed a pane of glass on the door and entered the apartment, where he found the baby lying on the floor. After putting Bernice back in her crib, he made a telephone call in an effort to locate Toby. He then left the apartment, taking with him a book containing addresses and telephone numbers. As he was about to drive away, he saw Bernard Wagner riding in a car with two men, Robert Adams (husband of Mary Adams) and one Freeman Clifford. The car was driven by Clifford.

Rocco proceeded to follow the car. Having been "cut off" by Rocco's car, Clifford brought his to a stop. Rocco got out, pointed a ".45 automatic" at Clifford and his companions, and said he wanted to talk to Bernard Wagner. Clifford told Rocco that Bernard wanted "to go back with his wife and kid and go straight." Following an altercation in which each threatened the other, Clifford returned to his car and drove off. Clifford stopped his car a second time because Rocco continued to follow. Rocco insisted that Bernard go with him to talk things over with Toby, but Bernard refused. A struggle then took place between Rocco and Clifford which was broken up by Bernard. Rocco then pointed his gun at Clifford and said, "You're dead." Clifford returned to his car and drove away, with Rocco again in pursuit. This time, as Rocco approached Clifford's car, he fired at the occupants. The bullet lodged in the back of the right front seat.

After Rocco left the scene of the shooting, one of the tires of his car blew out. He took three guns out of the glove compartment, put them in his pockets, and left the car in the roadway. He then went by taxi to Roxbury where he put in a telephone call to the Adams apartment. Mary Adams answered the telephone. Rocco, identifying himself as Tony Russo, asked for Toby, who came to the telephone. Rocco asked Toby to meet him in Jackson Square, but she suggested that he "come up to the house." Rocco agreed and said that "he would be there in a half an hour by himself in a cab." There was also testimony that she whispered to him: "You must be crazy, Rocco, don't come out here. They're waiting for you."

When Toby had left Rocco that afternoon, she went to the home of Mary Adams where she met her husband. About 7:30 p.m. Toby, her husband, their two children, and Mary and Robert Adams visited with the Clifford family in Dorchester. Toby left with her son about 10:45 p.m. Fifteen minutes later Mary and Robert Adams, Clifford, and Bernard left the Clifford home and went to 107 Centre Street. Mary Adams got out of the car and went to her apartment where she noticed that the glass on the door had been broken. After a discussion with Toby, who had arrived a few minutes later, the police were called. When they arrived Toby told them that Rocco had broken into the apartment; that she knew he was carrying a gun; and that he was an escapee. Shortly thereafter, Bernard Wagner telephoned the apartment and informed them that Rocco had fired a shot into Clifford's automobile. In response to a request for additional help, two more officers arrived.

It was arranged that the police officers would be stationed as follows: Officer Lovett was to remain in the "end bedroom" with Toby and Mark. Officers Calnan and Piatkowski were to stay in the living room. Patrolmen Hoffman and Ryan were stationed across the street from the apartment.

The three defendants met in front of 107 Centre Street about 1:45 a.m., paused momentarily, and then entered the

building. Rocco, who had four guns, gave Salvatore and Ciocco each a loaded gun. From his position in the apartment, Officer Lovett saw an arm come through the broken glass of the door window and reach toward the lock. Then he "heard a noise and . . . saw the door fly open as if it had been kicked." There was the sound of wood splintering as the door jamb was "broken" and "forced." They "came in . . . shooting and yelling." Piatkowski called out, "I am a police officer, drop it," whereupon Salvatore whirled and fired at him. Piatkowski shot back. Then a hand came around the door jamb and started to fire into the living room. Piatkowski emptied his gun, shooting at the hand. A gunfight ensued, in which all the defendants participated.

Mary Adams ran behind a "stereo set." From there she saw the accordion door, that separated the living room from the front bedroom, open. She saw Toby, who was holding Mark on her right hip, standing in the bedroom facing Rocco. Rocco shot Toby with a gun he was holding two or three feet from her head. Then he pointed it at her stomach and fired again. Mary Adams "thought he was shooting Toby in the stomach but it was the baby instead." "They both fell and the baby got up." When Piatkowski noticed there was a man in the bedroom, he ordered him to come out, but instead, Rocco started shooting into the living room. At this point, the officer fired into the bedroom for the first time.

During a lull in the shooting, Officer Lovett saw Mark walk down the hall toward him. He pushed Mark to the floor. About a minute later, he picked him up and placed him in a crib in the last bedroom. There was blood on the linoleum where the child had been lying.

As the three defendants fled from the apartment, the last man out shot at Officer Hoffman, one of the two officers stationed outside the building. The defendants then made their escape in a Chevrolet convertible. During the chase which followed, there was an exchange of gunfire by Officers Ryan and Hoffman with the defendants. The two

officers kept the escape car in constant view as they followed in the police cruiser. At one point the four guns carried by the defendants were thrown from their car. These were subsequently recovered by the police and introduced in evidence. The chase ended at the intersection of Massachusetts and Westland avenues, when the escape car collided with a taxicab. Ciocco was apprehended at the scene of the accident and taken to the police station.

Later that morning, about 2:40 A.M., Rocco, under the pretense that he was Toby's father, called the Adams apartment and asked how Toby and the baby were. "And he asked . . . [Mary Adams] if they were dead." Sometime later, Rocco surrendered to the police. Salvatore fled to New Jersey, where he remained for two days. Upon learning that his brother Rocco had surrendered, he did likewise.

Autopsies were performed on the two victims. The bullet which killed Mark had passed completely through his body. The track of the bullet was consistent with his being held on his mother's right hip. The examination of Toby revealed a bullet and a fragment of a bullet in her brain. It was the opinion of the medical examiner that the cause of her death was gunshot wounds of the head.

The ballistic testimony established that the fatal shots had been fired by one of the defendants. The spent bullet removed from Toby's brain was a ".32 S. & W. long Lubaloy Western." A .32 caliber Colt, one of the four guns carried by the defendants, was the only one capable of firing that bullet. None of the pistols carried by the police could have done so. The evidence, apart from the observations of Mary Adams, tended to indicate that the murder weapon was one of the two guns carried by Rocco.

1. The motions of the defendants for directed verdicts were properly denied. On the breaking and entering indictment there was ample evidence from which the jury could have concluded that the defendants broke and entered a dwelling house in the night time with the intent to commit an assault with a dangerous weapon and that their entry

was without the implied or express consent of Mary Adams. See G. L. c. 266, § 14. The jury also could have found that Rocco shot and killed Toby and Mark Wagner while engaged in the commission of this felony. This would provide a sufficient basis for his conviction of first degree murder under G. L. c. 265, § 1, which provides that "Murder committed . . . in the commission or attempted commission of a crime punishable with death or imprisonment for life, is murder in the first degree." The other two defendants could likewise be found guilty under this same section. If "two or more 'combine to commit a . . . [felony] and a homicide results, each is criminally responsible for the acts of his associates in the perpetration of the common design for which they conspired; and it is no defence for the associates engaged with others in the commission of a . . . [felony], that they did not intend to take life in its perpetration.' " *Commonwealth* v. *Devereaux,* 256 Mass. 387, 392. *Commonwealth* v. *Devlin,* 335 Mass. 555, 567. Whether the killing could also be found to have been with deliberately premeditated malice aforethought need not be discussed. See *Commonwealth* v. *Devlin, supra,* at 567.

2. Each defendant requested an instruction that he could not be found guilty of murder unless the jury found beyond a reasonable doubt that the bullet which caused the death of Mark or Toby came from a gun held by one of the defendants. The judge denied these requests subject to the defendants' exceptions and charged that if the jury were "in doubt as to whether the bullet which struck Mark Wagner came from a gun fired by one of the defendants or whether the bullet came from a gun fired by the police, then I instruct you that what the police did by way of returning fire in resisting these defendants, if you have found that these defendants entered and shot first, is justified and if a bullet of the police under these circumstances hit Mark Wagner, his death is imputable to these defendants and they are guilty of murder." A similar instruction relating to Toby was given. The effect of the denial of the requested instructions and those given was to permit the jury to find the defendants guilty of murder even if Toby or

Mark were the victims of police gunfire.   In this there was error.

The defendants were found guilty of first degree murder under G. L. c. 265, § 1, which incorporates the technical definition of murder as it was recognized at common law. *Commonwealth* v. *Gardner,* 11 Gray 438, 443.   *Commonwealth* v. *Desmarteau,* 16 Gray, 1, 9.   *Commonwealth* v. *Tucker,* 189 Mass. 457, 490.   Thus the common law felony-murder doctrine is still a part of our criminal law.

The felony-murder rule as it was formulated in England was a doctrine of constructive malice.   To make out a case of murder it was necessary only to establish that the defendant had committed a homicide while engaged in the commission of a felony.   No other evidence had to be introduced to prove the essential element of malice aforethought.   3 Coke Institutes, 52.   Foster, Crown Cases and Crown Law, 258 (3d ed.).   1 Hale, P. C. 465.   This was the only function which the rule performed; it obviated the necessity of establishing malice aforethought by other means.   See Royal Commission on Capital Punishment, Report, 25–33; Morris, The Felon's Responsibility for the Lethal Acts of Others, 105 U. of Pa. L. Rev. 50, 58–59.

This court has applied the felony-murder rule only in this limited fashion.   E.g., *Commonwealth* v. *Venuti,* 315 Mass. 255, 258; *Commonwealth* v. *Devlin,* 335 Mass. 555, 567.   The Commonwealth now urges, however, that we should give this rule an entirely new construction so that a killing by a police officer in resisting the commission of a felony is to be imputed to those committing the felony. This we expressly declined to do in *Commonwealth* v. *Campbell,* 7 Allen, 541.

In that case (tried before the full court) the defendant was charged with murder which arose out of a Civil War draft riot.   A military force was called out to suppress the riot with the result that there was an exchange of gunfire between the soldiers and the mob.   The Commonwealth asked that the jury be instructed that if the defendant had participated in the riot, and, during the attack by the mob a homicide took place, the defendant was guilty of manslaughter, even though the evidence failed to show whether

the lethal shot was fired by a rioter or a soldier. The point was one of first impression, and the court in a carefully considered opinion by Bigelow, C.J. said: "No person can be held guilty of homicide unless the act is either actually or constructively his, and it cannot be his act in either sense unless committed by his own hand or by some one acting in concert with him or in furtherance of a common object or purpose." *Commonwealth* v. *Campbell, supra,* at 544-546. Accordingly, the jury were instructed that "unless they . . . [were] satisfied beyond a reasonable doubt that the deceased was killed by means of a gun or other deadly weapon in the hands of the prisoner, or of one of the rioters with whom he was associated and acting, he . . . [was] entitled to an acquittal."

This decision appears to have become the leading case on the subject and has generally been followed in other jurisdictions. See *People* v. *Washington,* 62 Cal. 2d 777 (felon not guilty where accomplice killed by victim of the robbery); *Butler* v. *People,* 125 Ill. 641 (felon not guilty although rowdy conduct resulted in killing of bystander by town marshal); *Commonwealth* v. *Moore,* 121 Ky. 97 (felon not guilty where victim of robbery killed a bystander); *People* v. *Wood,* 8 N. Y. 2d 48 (felon not guilty where two persons were killed by person who had gone to aid of police); *State* v. *Oxendine,* 187 N. C. 658 (felon not guilty where victim of assault killed a bystander). Compare the so called "shield" cases in which persons engaged in the commission of a felony compel the victim of the homicide to occupy a position of danger in order to aid the felons in perpetrating the felony or in making their escape. *Wilson* v. *State,* 188 Ark. 846. *Keaton* v. *State,* 41 Tex. Cr. 621.

Two jurisdictions (Pennsylvania and Michigan) have departed from the limited common law function of the felony-murder rule, namely, that of imputing the necessary mens rea, but not imputing the necessary actus reus.[1] See *Peo-*

---

[1] In California the district court of appeals has also adopted the position urged by the Commonwealth in this case. See *People* v. *Harrison,* 176 Cal. App. 2d 330. But in a very recent case the California Supreme Court expressly rejected this view. *People* v. *Washington,* 62 Cal. 2d 777.

*ple* v. *Podolski,* 332 Mich. 508, cert. den. sub nom. *Podolski* v. *Michigan,* 344 U. S. 845 (felon guilty where police officer killed by another police officer);[1] *Commonwealth* v. *Almeida,* 362 Pa. 596 (felon guilty where off-duty police officer killed by another police officer), cert. den. sub nom. *Almeida* v. *Pennsylvania,* 339 U. S. 924; *Commonwealth* v. *Thomas,* 382 Pa. 639 (felon guilty where accomplice killed by victim of felony). But this departure in both jurisdictions appears to have been short lived.

In *Commonwealth* v. *Redline,* 391 Pa. 486 (felon not guilty of murder of accomplice killed by police officer), a majority of the court expressly overruled the decision in the *Thomas* case. The court distinguished the *Almeida* decision on the ground that the victim in that case was not a felon, and hence the homicide was not "justifiable." But then the court proceeded to cast doubt upon the very distinction it relied upon, saying, "It is, of course, true that the distinction thus drawn between *Almeida* and the instant case on the basis of the difference in the character of the victims of the homicide is more incidental than legally significant so far as relevancy to the felony-murder rule is concerned" (pages 509–510). It would appear from subsequent decisions of that court that the *Almeida* doctrine is no longer law. Thus, in *Commonwealth* v. *Root,* 403 Pa. 571, 575, it was said that the "rationale of the *Almeida* case was flatly rejected by this Court in *Commonwealth* v. *Redline* . . . where we held that the tort liability concept of proximate cause is not a proper criterion of causation in a criminal homicide case." See *Commonwealth ex rel. Hough* v. *Maroney,* 402 Pa. 371, cert. den. sub nom. *Pennsylvania ex rel. Hough* v. *Maroney,* 366 U. S. 971; *Commonwealth ex rel. Almeida* v. *Rundle,* 409 Pa. 460.

The Michigan Supreme Court has similarly retreated from its decision in *People* v. *Podolski, supra,* which held

---

[1] Departures from the rule of the *Campbell* case have been adversely criticised by distinguished commentators. Hall, General Principles of Criminal Law (2d ed.) 274–281. Morris, The Felon's Responsibility for the Lethal Acts of Others, 105 U. of Pa. L. Rev. 50, 56. But see Perkins on Criminal Law, 631–633.

that a killing of one police officer by another during a gun-fight was imputable to the felon. In *People* v. *Austin,* 370 Mich. 12, a majority of the court affirmed the quashing of an information charging two cofelons with the murder of their accomplice who was killed by their intended victim during the course of a robbery. The decision, however, found it unnecessary to overrule the *Podolski* case, apparently on the same ground relied on in the *Redline* case.

We think that the same rule of law should apply in situations where an innocent person is killed as in those where a felon is a victim. "A distinction based on the person killed . . . would make the defendant's criminal liability turn upon the marksmanship of victims and policemen. A rule of law cannot reasonably be based on such a fortuitous circumstance." *People* v. *Washington,* 62 Cal. 2d 777, 780. See Morris, The Felon's Responsibility for the Lethal Acts of Others, 105 U. of Pa. L. Rev. 50, 56. The basic question is whether a felon can be held criminally liable for the death of any person killed by someone resisting the commission of the felony. We hold that he cannot be. Having carefully examined the relevant authorities on the subject, we are not disposed to depart from *Commonwealth* v. *Campbell,* 7 Allen, 541, which has been the law of this Commonwealth for more than one hundred years. It follows that the judge erred in refusing the requested instructions and in charging as he did.

3. The defendants assign as error the denial of their pre-trial motions to be permitted access to witnesses.[1] Immediately before trial these motions were renewed, but again they were denied. The day after their arraignment, Mary Adams, Robert Adams and Bernard Wagner were held as material witnesses. Mary Adams recognized in the sum of $1,000 and from that time until the time of her appearance at the trial she was kept in seclusion by the Commonwealth. Bernard Wagner and Robert Adams were

---

[1] Each of these motions requested the court "to make available said witnesses at a reasonable time and place in order that defendant's counsel be afforded the opportunity of interviewing said witnesses."

each ordered to recognize in the sum of $25,000 and for failure to do so they were committed to the Middlesex County Jail in East Cambridge. It appears that the district attorney had left orders at the jail that no one was to see Wagner or Adams without his permission and that counsel for the defendants sought his permission but it was refused.

The question presented by these motions has never been decided by this court. Elsewhere, the decisions are not uniform. Some courts have held that counsel for a defendant must be given an opportunity to interview witnesses who are in the custody of the State. *Hodgins* v. *State,* 139 Fla. 226, 227–230. *State* v. *Gangner,* 73 Mont. 187, 194–195. *Hamilton* v. *State,* 68 Tex. Cr. 419, 428. *Wilson* v. *State,* 93 Ga. App. 229. *State* v. *Berstein,* 372 S. W. 2d 57 (Div. 2, Supr. Ct. Mo.), cert. den. sub nom. *Berstein* v. *Missouri,* 376 U. S. 953. See *Bobo* v. *Commonwealth,* 187 Va. 774. Contra, *State* v. *Goodson,* 116 La. 388, 401. Others have held that the matter is within the court's discretion. Thus, because of special circumstances, the trial court's denial of access to prospective prosecution witnesses has been upheld as a proper exercise of discretion. *State* v. *Clark,* 125 Kans. 791, 796 (the defendant waived preliminary examination where he could have discovered the nature of the testimony). *Wilkerson* v. *State,* 57 S. W. 956, 958 (Tex. Cr.) (State need not compel interview to which a witness refused to submit). *State* v. *Storrs,* 112 Wash. 675, 677–679 (insane witness was in love with the defendant). But in the absence of special circumstances, it has been held that the denial of access to witnesses amounted to an abuse of discretion. *Exleton* v. *State,* 30 Okla. Cr. 224, 233–234.

We think the better view is that counsel for a defendant should be accorded, as of right, an opportunity to interview prospective witnesses held in the custody of the Commonwealth. Witnesses belong neither to the Commonwealth nor to the defence. They are not partisans and should be available to both parties in the preparation of their cases.

We fail to see why the fact that they have been taken into custody changes their status and thus endows the Commonwealth with the exclusive right to interview them.

Our Constitution secures to a defendant the right to present his defence. Under art. 12 of the Declaration of Rights, a defendant "shall have a right to produce all proofs that may be favorable to him." If the Commonwealth could prevent access to material witnesses by holding them in its custody, this constitutional guaranty would be seriously impaired. To say that a defendant has a right to present his defence and then to deprive him of the means of effectively exercising that right would reduce the guaranty to an idle gesture.

The Commonwealth contends, however, that there has been no showing that the requests for interviews were not "fishing expeditions" or that the pre-trial interrogation of these witnesses would have aided the defence. There is, to be sure, some authority that where access to witnesses has been denied it is incumbent upon the defendants to show how they were prejudiced. See *Frazier* v. *State,* 142 Miss. 456, 461; *Atkins* v. *State,* 115 Ohio St. 542, 549–554, cert. den. 274 U. S. 720, 743; *State* v. *Storrs,* 112 Wash. 675, 677, 679. But this view does not commend itself to us. What the posture of the defence here would have been if the interviews had been granted is within the realm of conjecture. Although we have before us the testimony of Mary Adams, Robert Adams, and Bernard Wagner, we do not know what their testimony might have been or what other evidence might have been introduced if defence counsel had had the benefit of pre-trial interviews. The Commonwealth argues in effect that the defence must sustain a burden of establishing what might have been when the Commonwealth by its own action has rendered the sustaining of such a burden difficult if not impossible. Nor is there any greater persuasiveness to the contention that the interviews could have been "fishing expeditions." Pejoratives of this sort are no answer. It is too plain to be labored that the interviewing of prospective witnesses is an essen-

tial part of the preparation of a case for trial. That the witnesses, as the Commonwealth argues, were "victims" of the acts of the defendants does not alter the defendants' rights.

The denial of the defendants' motions was prejudicial error and this error tainted the murder convictions and the convictions for breaking and entering. If there had been a showing of special circumstances, it would have been appropriate for the court to impose reasonable conditions and restrictions on the interviews. But there was no such showing here and the denial of the motions was unconditional. Compare *Holladay* v. *State,* 130 Tex. Cr. 591, 593.

4. The defendants contend that their motions for copies of the minutes of the grand jury should have been granted. The law in this Commonwealth is well settled that a defendant is not entitled, as of right, to obtain a copy or examine the minutes of the grand jury. *Commonwealth* v. *Giacomazza,* 311 Mass. 456, 462. *Commonwealth* v. *Galvin,* 323 Mass. 205, 211. *Commonwealth* v. *Ries,* 337 Mass. 565, 583. These motions were addressed to the discretion of the court, and the record does not disclose an abuse of this discretion. There was no error.

5. All the issues argued by the defendants have been considered. Those not discussed are either without merit or present questions not likely to arise at a new trial.

6. The judgments are reversed and the verdicts are set aside.

*So ordered.*