COMMONWEALTH *vs.* DAVID C. CARITA & others.

Suffolk. February 3, 1969. — June 4, 1969.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK, & REARDON, JJ.

*Homicide. Robbery. Evidence*, Admissions and confessions, Of consciousness of guilt. *Practice, Criminal*, Trial of indictments together, Disclosure of evidence before grand jury, Access to witnesses, Fair trial, Newspaper article. *Error*, Whether error harmful. *Jury and Jurors.*

Evidence at the joint trial of four acquaintances upon an indictment for murder in the first degree of a clerk of a liquor store who was found in a snowbank outside the store shortly after a robbery therein and died from a gunshot wound warranted conviction of a defendant who had been in the company of his codefendants for the greater part of the two days during which the murder occurred, was present in an apartment and carrying a gun when a codefendant proclaimed he had a "score," left the apartment with his codefendants shortly before the murder and returned there with them shortly after it, and subsequently fled and was arrested in a foreign State where he was employed under an assumed name. [136–137]

At a joint trial of four defendants for murder and armed robbery, it was error under the rule of *Bruton* v. *United States*, 391 U. S. 123, requiring reversal of the conviction of a defendant, to permit a witness to testify

to a confession made to her by a second defendant containing statements relating to the first defendant's participation in the crime, notwithstanding limitations imposed by the judge on the applicability of the confession contemporaneously with the witness's testimony and subsequently in the charge. [138–139]

At a joint trial of four defendants for murder of a liquor store clerk and armed robbery, there was no error under *Bruton* v. *United States,* 391 U. S. 123, in the admission of testimony of a friend of two of the defendants that one of those two told the witness that "we" held up the store, "we" got rid of guns and a car, that "they" did not get anything because "they" dropped the money, that the owner had come out of the store and fired shots at "them," and that "they" had fired shots back and killed him, since there was no identification of "we," "they" and "them". [139]

There was no merit in contentions by four defendants tried jointly for serious crimes, three of whom were called to the witness stand by codefendants and refused to testify, invoking their privilege against self-incrimination under the Fifth Amendment of the Constitution of the United States, that denial of their respective motions for severance was error in that the necessity for invoking the privilege when called to the stand placed an unconstitutional burden on the privilege, and in that a defendant calling an invoking codefendant to the stand was deprived of the right to put in vital testimony. [139–140]

At a criminal trial, testimony by a police officer describing his journeys to a number of locations in search of the defendant after commission of the crime was inadmissible to show flight and consciousness of guilt unless it was also shown that the defendant customarily had resorted to such locations. [140]

Where motions by indicted defendants before trial to inspect the minutes of the grand jury did not show a "particularized need" for an inspection, there was no abuse of discretion in denial of the motions. [140–141]

At the trial of indictments for murder by shooting and armed robbery, where a witness for the Commonwealth who had testified before the grand jury testified on direct examination that on the day of the crimes she had seen a gun in the hand of one of the defendants and described it in great detail, and on cross-examination admitted that she had not disclosed this information to any police officer until after the return of the indictments, the defendants showed a "particularized need" for inspection of her testimony before the grand jury, and denial of their motions then made for such an inspection was prejudicial error. [141–142]

The right of defendants in a criminal case to interview a prospective witness who was held in the custody of the Commonwealth was not satisfied where counsel for the defendants went to a jail to see the witness and were refused permission to do so by a jail officer on the basis of a telephonic communication from some individual who stated that the witness did not desire to see the defendants' counsel. [142]

No prejudice to defendants tried together for serious crimes was shown in failure to grant their motions for a continuance by reason of publica-

tion of a newspaper article five days before trial mentioning their records as criminals where the trial judge in addition to the statutory questions on voir dire asked each prospective juror whether he had read the article and no juror seated answered that he had read it or was in any way affected by it. [143]

No constitutional right of defendants tried together for murder appeared to have been violated by excluding from the jury persons who tended to be opposed to capital punishment where, upon recommendation of the jury, the death penalty was not imposed after verdicts of guilty of murder in the first degree. [143-144]

Two INDICTMENTS found and returned in the Superior Court on February 10, 1966.

Motions were heard by *Lurie, J.,* and the cases were tried before him.

*Robert A. Stanziani* for the defendant Wise.

*Thomas C. Troy* for the defendant Fondanova.

*Henry E. Quarles, Sr.,* for the defendant Carita.

*Albert L. Hutton, Jr.,* for the defendant Lynch.

*Lawrence L. Cameron,* Assistant District Attorney, for the Commonwealth.

REARDON, J.   The defendants, David C. Carita, Sabatino A. Fondanova, Francis B. Lynch and Paul J. Wise, appeal under G. L. c. 278, §§ 33A–33G, as amended, their convictions on indictments charging them with murder in the first degree and armed robbery.   The jury having in each case recommended that the death sentence be not imposed on the murder indictments, the defendants were sentenced to life imprisonment.   On the indictments for armed robbery, sentences for terms of years were imposed to be served concurrently with the several sentences on the convictions for murder.   The cases are before us on a summary of the record, a transcript of the evidence and assignments of error.

There was evidence that at approximately 10:20 P.M. on February 3, 1966, Morris J. Yanes, a clerk employed by Sandler's liquor store on Columbia Road in Dorchester, was discovered in a snowbank outside that establishment.   He was removed to the Boston City Hospital where a quarter of an hour later he was pronounced dead.   An autopsy report subsequently determined that he met his death as a

result of a gunshot wound in the chest causing massive hemorrhaging.

The four defendants, who knew each other, spent the evening of February 2, 1966, in a cocktail bar, leaving about 1 A.M. on February 3, in the company of four girls with whom they went to the defendant Carita's apartment where they proceeded to drink beer and take pills containing narcotics. This party lasted until 8 A.M. At 3:30 P.M. the defendants had come together at the apartment of one Rita Howlett where Carita announced he had a "score." He further stated, "I can get the car; I can go like a teacher or, if I have to, I can go fast like hell." On this occasion guns were in the hands of three of the defendants; Fondanova had a forty-five calibre weapon while Carita had a thirty-two calibre weapon and Wise a twenty-two calibre weapon. Carita left the apartment about 7 P.M. and returned in an hour. One D'Ambrosia had parked a 1965 maroon Pontiac on Stoughton Street, near Harrison Avenue, Boston, on that evening and when he returned an hour and a half later the car was gone. The defendants left the Howlett apartment together at 9:15 P.M. in a maroon Pontiac with Carita driving and returned at 11:15 P.M.

Two witnesses who had just completed a purchase at Sandler's liquor store were a few minutes later walking down a nearby street when they heard shots. Both saw a maroon Pontiac headed south on Columbia Road with a man running alongside. One of these witnesses testified that the running man resembled Fondanova. The second witness returned to the snowbank where Yanes was lying, turned him over, and observed blood coming from his chest. He found in the snowbank a fifth of Scotch whiskey and $11 in bills which he later turned over to the police. A third witness also heard the shots and saw the maroon Pontiac pulling away with a man looking like Fondanova running beside the car.

A woman and her young son, who lived across the street from the liquor store, likewise heard the shots and from their window saw two men run from the liquor store and exchange shots. The son saw one of the men grab his chest

and fall. His mother recognized the victim as Yanes. Both saw the maroon Pontiac leave the scene with three occupants inside and a man running beside the car. Both identified pictures of the stolen Pontiac as resembling the car which they saw depart the scene. Police arriving at the store took into custody the $11 in bills, the bottle of Scotch whiskey, a twenty-five calibre revolver belonging to Yanes from which four rounds had been fired, and a fully loaded thirty-eight calibre weapon in a holster strapped around the victim's waist which had not been fired. Several hours later the police found the stolen Pontiac sedan a half mile from the liquor store with several shattered windows and containing two thirty-two calibre casings and one spent twenty-two calibre bullet. A second clerk at Sandler's liquor store found on an inventory the following morning that $11 and one bottle of Cutty Sark Scotch whiskey were missing.

The several defendants were arrested in various locations during the following month, one in a South Boston closet, one in Princeton, New Jersey, and Carita in Dorchester where he was observed at the time of his arrest to hurl a thirty-two calibre weapon from a bedroom window.

Counsel for the four men took one thousand, six hundred and fourteen exceptions to rulings made by the trial judge during the course of the trial. We concern ourselves with the comparatively few exceptions which form the basis for the assignments of error and treat with additional evidence adduced and not previously referred to as may be necessary in our disposition of those assignments.

1. Prior to a discussion of a number of assignments of error we treat with the claim of the defendant Wise that it was error to deny his motion for a directed verdict of not guilty on the murder indictment brought against him. His argument is premised on the consideration that evidence was lacking to prove that he participated in the robbery or attempted robbery. Notwithstanding that he alleged no assignment of error in this regard, he has argued the motion at length in the defendants' brief and we consider it. In

sum, there was evidence that he was in the company of his fellow defendants for the greater part of two days, that he was present when Carita proclaimed he had a "score," that at that time he was in possession of a twenty-two calibre gun, that he left the Howlett apartment in company with the other defendants prior to the time the crime was committed, and that in addition to other evidence to which reference has been made he engaged in flight and was ultimately arrested in New Jersey where he was employed under an assumed name. The evidence against him was substantial enough to warrant the denial of his motion.

2. Carita's assignments 19, 20 and 21, Fondanova's assignments 2 and 30, Lynch's assignments 1, 22, 23 and 24, and Wise's assignment 45 raise the question of possible error by the court in denying the defendants' motions to sever. The defendants argue that the Commonwealth was aware of, and the attention of the trial judge was called to, the possibility that admissions and confessions might during the course of trial be offered against one defendant which would have the effect of incriminating one or more of his fellow defendants. They further argue cases of individual prejudice in that being called to take the stand by certain of their codefendants their refusal to testify amounted to prejudicial comment which created for each of them a "serious dilemma." They claim that "they had a right under one constitutional provision to cross-examine regarding evidence which came into the trial against them and at the same time were possessed of a countervailing constitutional right not to take the witness stand or in any other way be compelled to incriminate themselves."

We deal first with the evidence which is under attack. This consists of two alleged admissions or confessions. The first one was introduced through the witness MacAskill, a friend of Lynch and Fondanova, who testified, "I asked Lynch if he had stuck up the liquor store on Columbia Road the night before." In response to the question, "What did he say?" he replied, "He said, 'Yes, we did,' and he said, 'But there's no worry about getting caught, because we got

rid of the guns and the car, and there were no witnesses.'
He then said that they didn't get anything, because they fell
on the street coming out of the store and dropped the money.
He said that the owner had come out and fired shots at
them, and that they fired shots back and killed him."

The second was elicited through the witness, Joyce
O'Brien, who testified as follows. "He [the defendant,
Fondanova] told me that there was a holdup and that it got
fouled up." THE COURT: "He told you there was a
holdup and that it got fouled up? What else did he tell you,
if anything?" THE WITNESS: "He told me that Carita
went into the store." THE COURT: "He told you that Carita
went into the store?" THE WITNESS: "And that he came
running out, Carita came running out of the store and there
was a man running after him shooting at him. And he said
— he said Carita shot the man." THE COURT: "He said
Carita shot the man?" THE WITNESS: "Yah. And I
asked him, I said, What did you do? And he said —"
THE COURT: "You asked him 'What did you do' and he
said what?" THE WITNESS: "He said he didn't know what
to do, so he ran for the car. And that the car was leaving
without him and he almost didn't make it." THE COURT:
"The car was leaving without him and he almost did not
make it?" THE WITNESS: "Yah. And he said he thought
that the man was dead, and he was sorry he got mixed up
in it." The defendants contend that the vice inherent in
the admission of this material was not cured by the limita-
tions relative to it imposed by the trial judge contempo-
raneously or by similar limitations appearing in his charge.

The Commonwealth notes in its brief that the answer of
the witness Joyce O'Brien implicating Carita as the person
who shot the victim took it by complete surprise.

The case was tried through most of the month of July,
1966. Bruton v. United States, 391 U. S. 123, came down on
May 20, 1968, and was followed by Roberts v. Russell, 392
U. S. 293, on June 10, 1968, which gave the Bruton case
retroactive application to State and Federal prosecutions to
crime.

The *Bruton* case, which binds us, set aside the conviction of a defendant at a joint trial although the jury were instructed that a codefendant's confession inculpating the defendant was to be disregarded by the jury in their determination of the defendant's guilt or innocence. The *Bruton* opinion compels us to hold that the admission of the statements of Fondanova relating to Carita's participation in the crime was reversible error. We must order that he be given a new trial. This disposition illustrates the complexities caused by the *Bruton* case which now attend the prosecution of those allied in a criminal enterprise and the burdens which it imposes on courts and prosecuting authorities alike.

We are not of the same mind, however, about the first of the two confessions, that of the defendant Lynch. Here, references were to "we," "they," and "them," without further identification. These are not sufficient to bring the effect of the witnesses' testimony within the *Bruton* doctrine and we decline to so expand it. In a similar situation, in *United States* v. *Lipowitz,* 407 F. 2d 597, 600, 602 (3d Cir.), a conviction was affirmed where there had been admitted at the trial evidence of a statement of a codefendant which did not designate the defendant by name but which referred to "other fellows" involved in the crime. A review of the transcript of evidence provides no further indication to us that the *Bruton* rule affects other parts of the record.

The second main contention of the defendants relative to severance is based on the call of three defendants to the stand by fellow defendants and their refusal to testify on the basis of Fifth Amendment rights under the Constitution of the United States. They now claim that the necessity of invoking the privilege placed an unconstitutional burden on the privilege. To accede to their argument on this point would be to afford to defendants tried jointly a readily available ground for manufacturing error. We do not accept the argument.

Finally, on the question of severance, we do not accept the argument of the defendants that invocation of the Fifth Amendment by the several defendants deprived their fellows

of the right to put in vital testimony. The refusal to testify could be asserted whether the defendants were tried separately or, as in this instance, together. There is nothing in the argument.

Although we view the *Bruton* case as requiring a new trial for Carita, we wish to comment on his assignment 9 dealing with testimony by a police lieutenant who described his journeys to a number of locations in search of Carita after the commission of the crime. Carita argues that there was no evidence tending to connect him with these locations or intimating that it was possible that he would be found at one of them. It is well settled that evidence of flight may be introduced to show consciousness of guilt. *Commonwealth* v. *Green,* 302 Mass. 547, 553. *Commonwealth* v. *Cataldo,* 326 Mass. 373, 376. *Commonwealth* v. *Corcoran,* 332 Mass. 615, 619. In *Commonwealth* v. *Geagan,* 339 Mass. 487, cert. den. 361 U. S. 895, we held at pages 511–512 that absence from home or place of a customary vocation is admissible as evidence of flight. However, we do not view absences from places not shown to be locations where an individual may customarily resort as properly admissible in evidence. The cumulative effect of such evidence to support consciousness of guilt is capable of an effect as injurious as it is invalid.

3. Carita's assignment 1 and Lynch's assignment 2 allege error in the denial by the trial judge of their motions to inspect grand jury minutes prior to trial. The two defendants have engaged in argument in their brief that they should have been allowed general access to the minutes based on considerations treated in *Dennis* v. *United States,* 384 U. S. 855, and particularly on the language appearing at pages 873–874, wherein it was stated, "In our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant facts." Barring further elaboration of this proposition, we are not inclined to depart from our present rule, which the defendants acknowledge, that grand jury minutes will not be made available in the absence of the showing of a "particularized need." *Commonwealth* v.

*Ladetto,* 349 Mass. 237, 244–245. *Commonwealth* v. *Balliro,* 349 Mass. 505, 518. *Commonwealth* v. *Cook,* 351 Mass. 231, 233. The motions of the defendants did not meet the test of our decisional law in this respect and we see no abuse of discretion in the action of the trial judge.

Linked to these assignments were Lynch's assignment 8, Wise's assignment 30, and Carita's assignment 7 alleging error in denial of motions by the respective defence counsel that they be furnished with the grand jury testimony of witness Barbara Liska.

These motions were generated during the course of trial when on direct examination she testified that on February 3, 1966, she saw a gun in the hand of the defendant Lynch and described it in great detail. On cross-examination she admitted that she had not disclosed this information to any police officer until February 15, 1966, after the indictments against the defendants had been handed down. She had previously testified before the grand jury prior to the return of the indictments. It could have been inferred that her expanded testimony at the time of trial resulted from threat of criminal prosecution unless she gave a more complete story.

The argument of the defence is that this sequence of events established the necessary "particularized need" to warrant opening up for perusal by the defence the Liska testimony before the grand jury. We agree. We have frequently stated that the extension of permission to examine grand jury minutes rests in the discretion of the judge. *Commonwealth* v. *Giacomazza,* 311 Mass. 456, 462. *Commonwealth* v. *Galvin,* 323 Mass. 205, 211. *Commonwealth* v. *Balliro,* 349 Mass. 505, 518. *Commonwealth* v. *Doherty,* 353 Mass. 197, 210. In this instance, apparent inconsistency on important details was shown in the Liska testimony at the trial and her testimony before the grand jury. We have had occasion to comment that in such a circumstance it is a commendable practice for the trial judge to read the grand jury minutes to determine if there is an inconsistency, *Commonwealth* v. *Kiernan,* 348 Mass. 29, 36, and if it be found to exist to

permit the defendant's counsel to examine the grand jury testimony. *Commonwealth* v. *Ladetto,* 349 Mass. 237, 245. *Commonwealth* v. *Abbott Engr. Inc.* 351 Mass. 568, 578–579. Here the defendants could properly maintain that the witness's expansion of her story at the trial set up a "particularized need" and constituted a possible contradiction of important fact of sufficient moment to show prejudicial error in the denial of their several motions. *Commonwealth* v. *Mead,* 12 Gray, 167. *Commonwealth* v. *Harris,* 231 Mass. 584, 586. *Commonwealth* v. *Homer,* 235 Mass. 526, 532–533.

4. Since the foregoing discussion and disposition of the defendants' assignments will require a new trial or trials, we mention certain remaining assignments which present issues likely to recur.

(a) Lynch, in assignment 3, and Wise in assignment 1 complain at the denial of their motions to be allowed to interview the witness Joyce O'Brien at a time when she was in custody in Suffolk County Jail. Counsel for Lynch and Wise had gone to the jail to see the witness and were refused permission by a jail officer on the basis of a telephonic communication from some individual who stated that the witness did not desire to see them. During a pre-trial hearing it was represented to the court by the assistant district attorney that she did not wish to be interviewed by any counsel for the defence except Mr. Cinamon, counsel for Fondanova, whom she did in fact see. We have had recent occasion to consider situations where the defence alleged it was denied the right to interview witnesses in the preparation of the case.

In *Commonwealth* v. *Balliro,* 349 Mass. 505, 515–518, there is a full discussion of the right of counsel for a defendant to interview prospective witnesses for the Commonwealth held in custody.

It should be clear from the *Balliro* case that counsel for a defendant is entitled to interview prospective witnesses held in the custody of the Commonwealth. That right is not satisfied in this case by an indirect communication to counsel that the witness did not wish to see them. In practice, in such situations counsel for the defence should within an ap-

propriate time file a motion to be allowed to interview the witness. The witness should thereafter be brought to court and instructed on his or her rights to consent or not to consent to an interview. A record should be kept of the proceedings. The answer of the witness will then determine whether an interview is to take place. If the answer is in the affirmative, a transcript of such interview may be taken in the discretion of the judge. See *Commonwealth* v. *Doherty*, 353 Mass. 197, 210–211.

(b) Fondanova's assignment 1 and Lynch's assignment 4 allege error in the failure of the court to grant their motions for a continuance because of a publication in the Boston Herald five days before trial mentioning their records as criminals. On voir dire the trial judge added to the statutory questions asked each prospective juror the question, "[D]id you read the article that appeared last week in the Boston Herald about this case?" There was no affirmative answer to that question by any juror who sat on the case that he or she had read the article or was in any way affected by it. No prejudice is shown. In fact, the trial judge followed the suggestion contained in *Commonwealth* v. *Crehan*, 345 Mass. 609, wherein we said at page 615 relative to alleged prejudicial publicity, "A proper course would have been to examine the jurors forthwith." See *Taylor* v. *Creeley*, 257 Mass. 21, 26; *Commonwealth* v. *Barker*, 311 Mass. 82, 87–88; *Commonwealth* v. *Bonomi*, 335 Mass. 327, 332–335; *Commonwealth* v. *Ries*, 337 Mass. 565, 568–569. Since no demonstrable prejudice stemmed from the badly timed article, and since therefore *Worcester Telegram & Gazette, Inc.* v. *Commonwealth*, 354 Mass. 578, is not apposite, as contended by the defendants, we see no merit in these assignments.

(c) Carita's assignment 2 and Lynch's assignment 5 allege error in exclusions from the jury of persons who tended to be opposed to capital punishment. However, as we said in *Commonwealth* v. *Francis*, 355 Mass. 108, 111, "this case does not come within the constitutional rule of *Witherspoon* v. *Illinois*, 391 U. S. 510, because the death penalty

was not imposed. *Bumper* v. *North Carolina,* 391 U. S. 543, 545. *Commonwealth* v. *Nassar,* 354 Mass. 249, 257. *Commonwealth* v. *Sullivan,* 354 Mass. 598, 608." We are not disposed to extend the *Witherspoon* and *Bumper* holdings.

5. In view of the preceding discussion and of certain other assignments of error which we do not discuss, we are of opinion that justice requires a new trial for the defendant Fondanova also. G. L. c. 278, § 33E.

*Judgments reversed and verdicts set aside.*