Sanders, Janet L., J.
This case arises from a robbery gone awry. As the Commonwealth’s evidence at trial showed, the defendant Robinson Tejeda and two others planned to hold up a drug dealer, only to have the target of the robbery kill one of the robbers, Christopher Pichardo. The defendant and the other surviving accomplice, Stephane Etienne, were both charged (among other things) with armed robbery and *427 with the murder of Pichardo, the Commonwealth proceeding under the felony murder rule. The two cases were severed for trial, and the case against Tejeda proceeded to a jury trial first before this Court.
Despite grave misgivings, the Court followed the most recent Supreme Judicial Court homicide instructions and told the jury that, if it were to find the defendant guilty of armed robbery, robbery as a matter of law was an inherently dangerous felony, so that the only remaining element that the Commonwealth had to satisfy in order to find the defendant guilty of murder was to demonstrate that Pichardo was killed during the commission of the robbery. The jury did indeed find the defendant guilty of armed robbery (and this Court sees no basis on which to disturb that conclusion). Since there was little question that Pic-hardo had been killed during the robbery, it was of no surprise that the jury went on to find the defendant guilty of murder. At sentencing, however, this Court set aside the guilty verdict on the murder charge, since I was convinced that, if the SJC were to confront this issue today, it would follow the majority of jurisdictions as well as its own precedent and conclude that the felony murder rule does not apply where one’s accomplice in the underlying felony is killed by the victim. This Memorandum explains this Court’s reasoning.
BACKGROUND
Viewed in the light most favorable to the Commonwealth, the evidence against the defendant was as follows. Frederick Reynoso was known by the defendant and others to sell marijuana among other drugs. Codefendant Etienne set up a meeting with Reynoso, ostensibly to purchase marijuana from him. Instead, according to the testimony at trial, Etienne together with the defendant and Pichardo (known as “Chino”) decided to “catch a lick” or rob the drug dealer. Pic-hardo had a gun and the defendant had the car that was needed to drive the three to the location where the drugs were stashed. In the early afternoon of January 14, 2012, they picked up Reynoso in Malden and proceeded to 23 Trull Street in Dorchester. Reynoso’s cousins, Jonathan and Luis Santiago, lived at that address.
Reynoso entered the front door of the house, and proceeded to the basement with Jonathan Santiago.[1] The defendant parked his car on a side street and remained there.
Pichardo, carrying a gun in his pocket, and Etienne walked to a side door of the house leading to the basement and were admitted by Jonathan Santiago. Inside the basement, Santiago, with Reynoso standing beside him, pulled out the marijuana and began to weigh it. Suddenly, Pichardo pulled his gun out of his pocket and announced: “You know what time it is?” It turned out, however, that Reynoso too was armed. He fired his weapon, striking Pichardo in the chest. Pic-hardo released a volley of gunshots, striking the walls of the basement. He then collapsed near the basement door as Santiago fled upstairs.
Etienne ran back to the car to get the defendant. They tried to pull Pichardo out of the basement but were unsuccessful: Pichardo was unconscious. Etienne retrieved Pichardo’s gun as well as his phone and the two men fled. At some point, they called 911. Pichardo was pronounced dead within minutes of his arrival at the hospital.
Reynoso, Etienne and the defendant were all charged with felony murder in the second degree, among other charges. As to the murder charge against Reynoso, the underlying felony was unlawful possession of a firearm, with which he was also charged. All three cases were severed and Reynoso went to trial in December 2013. On the charge of murder, he argued that he acted in self-defense and the jury was so instructed. The jury acquitted him of the murder charge and found him guilty on the firearms charge as well as a drug charge. The court (Fabricant, J.) sentenced him to two to four years in prison, with probation from and after that period of incarceration.
The defendant then went to trial before this judge. In addition to murder, he was charged with two counts of armed robbery (one count identifying Santiago as the victim and the other Reynoso), home invasion, possession with intent to distribute a Class D controlled substance and unlawful possession of a firearm. As to the murder charge against him, the underlying felonies upon which the Commonwealth relied were armed robbery and possession of a firearm.[2] Defense counsel throughout the trial argued that the felony murder charge was not properly before the jury and made motions both at the close of the Commonwealth’s case and at the close of the evidence for a required finding of not guilty on that charge. Although this Court found merit to the defense arguments, I decided that the safer course was to present the case to the jury and deal "with the issue raised by those motions if and when it became necessary.
The jury acquitted the defendant of one count of armed robbery and of the firearms charge. They found him guilty on the second count of armed robbery (that count that identified Jonathan Santiago as the victim), home invasion, possession of a class D substance with intent to distribute it, and felony murder, second degree. As to the murder charge, the verdict slip required the jury to be unanimous as to the underlying felony; they found that to be armed robbery, not the firearms charge. The defense renewed its motion for a required finding of not guilty on the murder charge. After extensive briefing, this Court allowed the motion and set aside the guilty verdict on that charge. The defendant was sentenced to six to eight years on the armed robbery, and three years’ probation on the home invasion and drug charges. The Commonwealth filed a notice of appeal.
Etienne is scheduled to go to trial July 2014.
*428 DISCUSSION
The concept of felony murder has its origins in the English common law, dating back some one thousand years to a time when all felonies were punishable by death. As one commentator noted, it was therefore of no particular moment whether the condemned was hanged for the initial felony or for any death that occurred in the course of the felony. Hitchler, The Killer and his Victim in Felony Murder Cases, 53 Dick.L.Rev. 3 (1948). Nevertheless, the historical record suggests that no English court ever applied the felony murder rule to hold a felon guilty where his co-felon was killed by the intended victim. Prevezer, The English Homicide Act: a New Attempt to Revise the Law of Murder, 57 Col.L.Rev. 624, 634 (1957). That remained true in America even as the number of felonies increased. Although it was widely recognized that the intent to commit the underlying felony supplied the malice required for murder, the rule was applied through the 1800s solely to situations where the felon or his confederate did the actual killing. Comment, 24 Rutgers L.Rev. 591, 600-01 (1970).
It was thus unsurprising that the SJC in 1863 took the position that it did when confronted with an issue similar to that faced by this Court. In Commonwealth v. Campbell, 89 Mass. 541 (1863), the defendant was part of an unlawful assembly when soldiers were called in to disperse the mob and ultimately fired on it. One William Currier was shot and killed, but the evidence failed to show whether the shot was fired by one of the rioters or by a soldier. As a consequence, the SJC concluded that the evidence was insufficient to sustain a murder conviction against the defendant. As it stated: “(n]o person can be held guilty of homicide unless the act is either actually or constructively his and it cannot be his act in either sense unless committed by his own hand or by someone acting in concert with him or in furtherance of a common object or purpose.” Id. at 545. Thus, had the evidence shown that the gunshot came from a fellow rioter, the felony murder rule would apply. If the gunshot came from a soldier, however, neither justice nor “sound legal principle” would support the application of the felony murder rule, since the act was committed by one who not only was unassociated with and unconnected to the common illegal enterprise (there, the riot) but was actively engaged in opposing or resisting the defendant and his confederates. Id. at 545.
As articulated by the SJC in Campbell, the basis for liability was premised on a theory of agency, and this made good sense. It was not the mere coincidence of homicide and a felony that was sufficient: in order to impute the malice necessary for one to be found guilty of murder, the death must have been done in furtherance of the underlying felony, not simply during its commission. If the death occurred at the hands of one resisting the felony and thus acting in deliberate opposition to the felon’s criminal undertaking, then the felony murder rule had no application. To take any other approach would lead to “extraordinary consequences” and would mean that a person might be held responsible for acts “which he could not either in fact or in law be deemed to have contemplated or intended.” Id. at 544.
This agency approach to the felony murder rule came to be the position adopted by the great majority of jurisdictions through the twentieth century. Thus, for example, in People v. Washington, the California Supreme Court reversed the defendant’s murder conviction where his accomplice in the robbery was killed by the robbery victim, a gas station attendant. 62 Cal.2d 777, 780, 402 P.2d 130, 132 (1965). The court reasoned that malice could not be attributed to the robber where the killing was not committed as part of the perpetration or attempt to commit the robbery but rather in order to thwart it. Similarly, in Commonwealth v. Redline, the Pennsylvania Supreme Court set aside the defendant’s murder conviction for the death of his co-felon shot by a police officer trying to apprehend them as they fled the scene of a robbery. 391 Pa. 486, 503-04, 137 A.2d 472, 480 (1958). After a thorough review of Pennsylvania case law as well as decisions from other states (including the SJC’s decision in Campbell, supra), the court concluded that the felony murder rule applies only where the conduct causing death was “in furtherance of the felonious undertaking,” and not merely coincidental with it. Id. at 495-96. The New Jersey Supreme Court reached the same conclusion in Commonwealth v. Canola, stating that “most modern progressive thought in criminal jurisprudence favors restriction rather than expansion of the felony murder rule.” 73 N. J. 206, 374 A.2d 20 (1977). Upholding the trial court’s dismissal of a murder charge where defendant’s co-felon was killed by the robbery victim, the Maryland Supreme Court similarly noted that to conclude otherwise would “thrust our state backward to the unenlightened era of criminal responsibility.” Jackson v. State, 589 P.2d 1052, 1053 (N.M. 1979). See also Davis v. Fox, 735 S.E.2d 259 (W.Va. 2012); Campbell v. State, 293 Md. 438, 451-52, 444 A.2d 1034, 1042 (1982); State v. Bonner, 330 N.C. 536, 546 411 S.E.2d 598, 604 (1992); State v. Severs, 759 S.W.2d 935, 938 (Tenn.Crim.App. 1988); Sheriff, Clark County v. Hicks, 89 Nev. 78, 82, 506 P.2d 766, 768 (1973).
That handful of states applying the felony murder rule more broadly have adopted an approach that essentially imports into the criminal law tort concepts of proximate cause.[3] Under this reasoning, the defendant is liable for any death proximately resulting from the unlawful activity. Accordingly, in People v. Lowery, the Illinois Supreme Court upheld a felony murder conviction in connection with the death of an innocent bystander: the defendant was attempting to rob another individual at gunpoint when, during a struggle over the gun, it discharged in the hands of the robbery victim, killing a passerby on the street. 178 Ifl.2d 462, *429 467, 227 Ill.Dec. 491, 494, 687 N.E.2d 973, 976 (1997). The court concluded that, since it reasonably might be anticipated that an attempted robbery would meet with resistance, those attempting to commit the robbery could be found guilty of murder when a bystander is killed in the course of that resistance, even though the death was not specifically intended by anyone. This was taken one step further in People v. Dekens, where the person killed was not an innocent bystander but rather an accomplice in the underlying felony, shot by a police officer resisting the felony. 182 Ill.2d 247, 695 N.E.2d 474 (1998). The trial judge had dismissed the murder charge on the grounds that the defendant could not be liable under a felony murder theory for the death of a co-felon since it was not committed in furtherance of the underlying felony. Relying strictly on Illinois law, the Illinois Supreme Court reversed: whether the decedent was a co-felon or an innocent bystander made no difference.
So where does Massachusetts stand today between these two polar opposites? Certainly, Campbell has not been overuled; indeed, one hundred years later in Commonwealth v. Balliro, the SJC made it clear that Campbell remained good law. 349 Mass. 505 (1965). In Balliro, the SJC was unequivocal in its holding: “(t]he basic question is whether a felon can be held criminally liable for the death of any person killed by someone resisting the commission of the felony. We hold that he cannot be.” Id. at 515. On the facts before it, that meant that the jury had to conclude that the bullet that killed a woman and her baby caught in the cross fire between police and the defendants came from the gun of one of the defendants before they could be found guilty of murder.
Twenty-three years later, however, the SJC seemed to pull back from that unequivocal position in the case of Commonwealth v. Santiago, 428 Mass. 39 (1998). In Santiago, a young woman was caught in the cross fire between two rival groups, and there was no forensic evidence as to whether the bullet came from the defendant’s gun or from the gun of one of his rivals. The SJC upheld the defendant’s murder conviction, not by overuling Campbell and Balliro, however, but by distinguishing them. The Court noted that even if the bullet came from the defendant’s opponent in the shootout, that individual was not resisting criminal activity, as were the police in Balliro or the soldier in Campbell; rather, that person was jointly engaged in the unlawful activity himself. Quoting Campbell the court stated: “as in the case of a duel, although to accomplish the common purpose they took opposite sides, still they might well have been deemed to have confederated together in an unlawful enterprise, and thus to have become responsible ... for a criminal act done in pursuance of the common design by any one of their confederates, with whichever side he may have acted in the affray.” Id. at 44.
The Commonwealth argues that the instant case is like Santiago and that it does not pose the same kind of problem regarding liability that the SJC struggled with in Campbell or in Balliro, where the fatal bullet could have come from the gun of a law enforcement officer imbued with the legal authority to take the actions that he did. Admittedly, Reynoso was not a police officer and was in unlawful possession of the gun that he fired, but a jury concluded that his act of shooting Pichardo was non-criminal in nature. More generally, the facts of the present case are quite different from the gun battle between rivals that ultimately led to the death of a bystander in Santiago. Reynoso and the three individuals (including the defendant) who planned to rob him could not be said by any stretch of the imagination to be jointly engaged in the same unlawful enterprise. Indeed, the unlawful enterprise that forms the basis for the felony murder charge against the defendant is robbery, with Reynoso and his cousin Jonathan as the victims. As to Reynoso, the unlawful activity that he was engaged in was possession of a firearm and a large amount of marijuana — conduct which he committed by himself and certainly without the defendant’s participation. In short, Pichardo’s death did not occur in the joint pursuit of criminal activity common to the defendant and his associates on one hand and Reynoso on the other.
The Commonwealth points out that in a footnote in Santiago, the SJC called into question whether Campbell remained good law. See 428 Mass. at 44, n.5 (expressing “grave doubt as to the continuing validity of the principle set forth in Campbell”). It also maintains that more recent rulings suggest that the SJC would interpret Massachusetts common law in accordance with that handful of jurisdictions, like Illinois, that have rejected an agency approach to felony murder. In particular, the Commonwealth plucks out language from the case of Commonwealth v. Hanright, 466 Mass. 303 (2013), where the Court reversed a lower court’s allowance of a motion to dismiss a murder indictment. In Hanright, the defendant had been indicted for the death for a police officer whom his coconspirator in a robbery had shot when trying to make his escape. The co-conspirator, Cinelli, also died in the exchange of gunfire but, tellingly, the Commonwealth did not charge the defendant with Cinelli’s death. The court did not therefore have to face the far more difficult question of whether one can be liable under the felony murder rule for the death of his co-felon.
Finally, even if the SJC were to overule Campbell and expressly join ranks with the minority of jurisdictions which have broadly applied the felony murder rule so as to extend a defendant’s liability to all the reasonably foreseeable consequences of the underlying felony, this Court would suggest that, in the unique circumstances presented by this case, that question of reasonable foreseeability is a question of fact which should be put to the juiy. This was not an alternative suggested by either party, nor did this Court think to entertain that idea on its own. It is a middle ground that the SJC could choose, in which *430 case the remedy would be a new trial on the murder charge. Until the SJC clarifies its position on this issue, however, this Court follows existing precedent. I also take the action that I do because it is more in accordance with justice.
CONCLUSION AND ORDER
This Court having ALLOWED the defendant’s Motion for a Required Finding of Not Guilty on Count I charging him with second degree murder, his conviction on that charge is VACATED and it is hereby ORDERED that a finding of Not Guilty be entered on that charge.

The house was equipped with outdoor cameras so the comings and goings of everyone involved were on video for the juiy to see.

Where the underlying felony carries a maximum sentence of life, then that provides the basis for felony murder in the first degree, not in the second degree. This Court concluded that the Commonwealth’s decision to charge the defendant with second degree murder instead did not prevent it from using armed robbeiy as the underlying felony. The defendant timely objected to this ruling, so it remains an issue on appeal and is not addressed by this Memorandum.

Exhibit B to the Defendants’ Supplemental Memorandum in Support of his Motion for a Required Finding contains a breakdown showing where all fifty states stand on the felony murder rule.